**Danny R. SMITH, Plaintiff-Appellee,**

v.

**PYRO MINING COMPANY, Defendant-Appellant.**

No. 85–6063.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 17, 1986.

Decided Sept. 1, 1987.

Rehearing and Rehearing En Banc Denied Nov. 18, 1987.

---

Edward Katze, Terry Price (argued), Constangy, Brooks and Smith, Atlanta, Ga., Sidney Hulette, Ruark and Hulette, Morganfield, Ky., for defendant-appellant.

Theodore H. Amshoff, Jr. (argued), Amshoff, Amshoff, & Searcy, Louisville, Ky., Richard L. Masters, for plaintiff-appellee.

Before ENGEL, JONES and KRUPANSKY, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

The defendant in this employment discrimination case appeals from a judgment

awarding damages to the plaintiff for discrimination on the basis of religion in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1)(1982). Because we find no error in the district court's disposition of this case, we affirm.

The plaintiff, Danny R. Smith, was hired by Pyro Mining Company on June 19, 1981, as a mechanic in an underground coal mine. Pyro employs over 1,000 persons who work underground and another 150 surface employees. During the time of his employment at Pyro, Smith was a member of the Independent General Baptist Church located in Ceder Hill, Kentucky. Smith also held the church offices of Treasurer and Trustee at the time. He subsequently became a Sunday School teacher. The official doctrine of the church precluded all officers and teachers in the church from working on Sundays, although individuals could work on Sunday and remain church members. Based on the teachings of his church, Smith believed that it was morally wrong to work on Sundays in the absence of a life threatening situation.

During his initial employment interview, Smith informed Varney Coleman, Mine Superintendent for Pyro, that he had religious convictions against working on Sundays. Despite his convictions, Smith worked for a time on Pyro's third shift, which required him to report for work at 11:00 p.m. on Sundays. Aside from these occasions, Smith was not required to work on Sundays during the first year of his employment.

On July 11, 1982, Pyro altered its work schedule and implemented an eight-day work week for employees stationed at the mine where Smith worked. The eight-day work week was instituted to improve mining efficiency. Under the new schedule, employees were assigned to work four consecutive ten-hour days and then have four consecutive days off. Each employee was required to work approximately twenty-six Sundays per year.

Prior to implementing the new schedule, Pyro publicized through a video presentation its policy of allowing employees who objected to working on Sundays to trade scheduled shifts with another qualified employee who was not scheduled to work the same shift.[1] Pyro also had a representative on hand to answer questions following the presentations. Under Pyro's policy of attempting to accommodate those unable to work on Sundays due to religious reasons, an employee was first required to attempt to arrange a shift swap with another qualified employee. If the employee was unsuccessful in that effort, he was then required to exhaust the opportunities afforded by Pyro's "Open Door Policy" to resolve the problem. The "Open Door Policy" was designed to allow an employee who had a work-related grievance or other problem to personally present the matter first to his supervisor and then up the chain of command to the president of Pyro, if necessary, to resolve the problem. All employees were given a handbook setting forth this policy prior to the implementation of the eight-day work week.

Smith was scheduled to work on the first Sunday that the new schedule went into effect. All employees were required to report to work on that Sunday, July 11, 1982. The entire company had been on a two-week vacation and prior to the vacation, Smith had informed his immediate supervisor, David Dunbar, that he would not be reporting for work on Sunday, July 11, 1982, due to his religious convictions. Smith called the office on Sunday and left word that he would not be reporting to work since he was going to church. He was subsequently given an unexcused absence for missing work that day.

---

1. The district court discribed the video presentation in the following manner. "Prior to the implementation of the eight-day work week, Pyro, through crude language and a format that had to be an insult to the intelligence of the great majority of those who viewed it, publicized its policy of allowing employees who objected to Sabbath work to trade shifts with other qualified employees. The sum of this publication consisted of quick references toward the end of the video between two persons portraying miners. The crux of the exchange comes when the miners are discussing the new eight-day week and Sunday work. One employee asked, 'What about preachers?' The other one replies, 'Hell, if they let us swap off to go fishing, I reckon they'll let the preachers swap off.'" App. at 189.

Smith was again scheduled to work on Sunday, August 15, 1982. Once again he informed his supervisor that he would be absent from work due to his religious convictions. He was given a second unexcused absence. After his second unexcused absence, Smith talked with David Dunbar, who in turn talked to mine superintendent Don Ramsey, who said that the unexcused absences would stand. Dunbar promised Smith that he would ask his son to swap work days with Smith, but this swap never took place. Smith also asked two other mechanics if they would swap with him and both declined. Smith then decided that it was wrong for him personally to ask someone to swap with him since he was, in effect, asking that person to sin. Smith, however, was willing to work in a swap arranged by the company.

After Smith's second unexcused absence, the Mine Manager, Danny Griffin, talked with him about his absences and was told by Smith that he did not believe in working on Sundays. Griffin told Smith to try and arrange a swap and to come back if nothing could be worked out. Griffin was aware that Smith considered it to be morally wrong to ask someone to work for him on a Sunday.

Smith was again scheduled to work on Sunday, August 22, 1982. He again notified his supervisor that he would not be reporting to work. He was given a third unexcused absence for missing work. Pyro had a company policy of automatically terminating any employee who accumulated three unexcused absences within a six-month period. In accordance with this policy, Smith was discharged on Monday, August 23, 1982, when he reported to work after his third unexcused Sunday absence.

On the day of his discharge, Smith appealed his termination to Coleman. At this time Smith proposed that the company allow him to work additional days in excess of the regular shift without overtime pay to make up for the Sunday absences. He also proposed that he be transferred to a surface job that did not require Sunday work. Both requests were refused by Pyro. At the time of the discharge, Coleman told Smith that he would look into the matter to see if anything could be done.

Coleman subsequently turned the matter over to the Assistant Manager of Employee Relations, Paul Hill. Hill conducted a cursory examination of the matter and concluded that Smith had been properly terminated.

Following his discharge, Smith filed a complaint against Pyro in federal district court alleging that Pyro had violated the religious discrimination provisions of Title VII by discharging him because of his religious beliefs. Pyro's answer denied Smith's allegations and claimed that Smith had refused to cooperate with Pyro's effort to accommodate his religious needs. Following a one day bench trial, the district court entered judgment for Smith, finding that Pyro had made no effort to reasonably accommodate his religious beliefs. The court further found that Pyro had not shown any undue hardship to justify its failure to accommodate Smith. On appeal Pyro challenges the following findings of the district court: (1) that Smith's religious beliefs were sincerely held; (2) that Pyro failed to reasonably accommodate Smith's religious beliefs; and (3) that Pyro failed to establish that accommodation would pose an undue hardship.

## I.

■ Title VII provides in part that "[i]t shall be an unlawful employment practice for an employer (1) to ... discharge any individual ... because of such individual's ... religion...." 42 U.S.C. § 2000e–2(a)(1)(1982). When Congress amended Title VII in 1972, it added the following definition of religion:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employees' ... religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. 2000e(j)(1982). "The intent and effect of this ... was to make it an unlawful employment practice ... for an employer not to make reasonable accommodations, short of undue hardship, for the religious

practices of its employees and prospective employees." *TWA v. Hardison*, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977). The obligation to accommodate includes efforts to accommodate those employees who refuse to work on particular days of the week because of their religious beliefs. *See, e.g., Murphy v. Edge Memorial Hospital*, 550 F.Supp. 1185 (M.D.Ala. 1982). "[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Ansonia Bd. of Educ. v. Philbrook*, ─ U.S. ─, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986). "[W]here the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship." *Id.*

The analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination. Such a case is established when an employee shows that: (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Turpen v. Missouri-Kansas-Texas R.R. Co.*, 736 F.2d 1022, 1026 (5th Cir.1984). Once the employee has established a prima facie case, the burden shifts to the employer to prove that it cannot reasonably accommodate the employee without incurring undue hardship. *See, e.g., id.; Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 401 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979).

■ Although the burden is on the employer to accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation.

An employee cannot shirk his duties to try to accommodate himself or to cooperate with his employer in reaching an accommodation by a mere recalcitrant citation of religious precepts. Nor can he thereby shift all responsibility for accommodation to his employer. Where an employee refuses to attempt to accommodate his own beliefs or to cooperate with his employer's attempt to reach a reasonable accommodation, he may render an accommodation impossible.

*Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978). *See also Brener v. Diagnostic Center Hospital*, 671 F.2d 141, 145–46 (5th Cir.1982) ("bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business").

[3, 4] The reasonableness of an employer's attempt at accommodation cannot be determined in a vacuum. Instead, it must be determined on a case-by-case basis; what may be a reasonable accommodation for one employee may not be reasonable for another. In *Redmond v. GAF Corp.*, 574 F.2d 897, 902–03 (7th Cir.1978), the Seventh Circuit noted that:

The term "reasonable accommodation" is a relative term and cannot be given a hard and fast meaning. Each case involving such a determination necessarily depends upon its own facts and circumstances, and comes down to a determination of "reasonableness" under the unique circumstances of the individual employer-employee relationship. The trier of fact is in the best position to weigh these considerations.

*Accord United States v. Albuquerque*, 545 F.2d 110, 114 (10th Cir.1976). If the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's religious beliefs without incurring undue hardship. *American Postal Workers Union v. Postmaster General*, 781 F.2d 772, 776 (9th Cir.1986); *McDaniel v. Essex Intern., Inc.*, 571 F.2d 338, 341 (6th Cir.1978). This court has noted that:

[A]n employer does not sustain his burden of proof merely by showing that an accommodation would be bothersome to administer or disruptive of the operating routine. In addition, we are somewhat

skeptical of hypothetical hardships that an employer thinks might be caused by an accommodation that never has been put into practice. The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted.

*Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir.1975). An employer may nonetheless establish undue hardship without actually putting an accommodation into effect. *Id.* An employer must still, however, present evidence of undue hardship; it cannot rely merely on speculation. *See, e.g., Brown v. General Motors Corp.*, 601 F.2d 956, 961 (8th Cir. 1979). With this legal framework in mind, we turn to an analysis of Pyro's claims of error.

## II.

■ The first issue we address is whether Smith established a prima facie case of discrimination. The necessary elements of Smith's prima facie case are that: (1) he had a sincere belief that working on Sunday was contrary to his religious beliefs; (2) he informed Pyro about his religious beliefs and the conflict they created with his job; and (3) he was discharged because of his refusal to work on Sundays. After reviewing the evidence, the district court concluded that Smith had established a prima facie case.

On appeal Pyro's challenge focuses on the first element of Smith's prima facie case; there is no dispute about the other elements. Pyro argues that since Smith had at one point worked from 11:00 p.m. to 12:00 a.m. on Sunday while he was on the third shift, his belief that it was morally wrong to work on Sundays was not sincerely held. The district court considered this fact in its opinion and concluded that it did not detract from Smith's sincerity.

A district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witness." Fed.R. Civ.P. 52(a). Factual findings will be deemed clearly erroneous on review only if,

after reviewing the entire record, the appellate court is left with the definite and firm conviction that a mistake has been made. *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Additionally, when, as was the case here, "findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.* 105 S.Ct. at 1512.

Under this standard, we are easily convinced that the district court's findings were not clearly erroneous. Smith testified at great length about his commitment to his religion. He also testified that the reason he went to work on the last hour of some Sundays was because by 11:00 p.m. on Sunday night, all church services had been concluded and, for all intents and purposes, the Sabbath was over. There is little doubt but that Smith was heavily involved with his church; he served as both an officer and a Sunday School teacher. Finally, no evidence was introduced by Pyro to show that Smith was engaged in anything other than religious activities on the Sundays he was absent from work. Accordingly, we reject Pyro's challenge to the prima facie determination.

## III.

■ Having found that Smith established a prima facie case of discrimination, our analysis now shifts to the question of whether Pyro reasonably accommodated Smith's religious beliefs as required by 42 U.S.C. § 2000e(j) (1982). Pyro argued before the district court that its consent to shift swapping, supplemented by its "Open Door Policy," was sufficient to satisfy its duty to reasonably accommodate Smith's religious beliefs. The district court rejected this assertion and held, in effect, that Pyro had to make an affirmative effort to reasonably accommodate Smith by arranging a swap for him. On appeal Pyro argues that the trial court's conclusion that Title VII required it to solicit replacements for Smith is reversible error. Pyro con-

tends that since it allowed its employees to trade shifts it thereby satisfied its obligations under Title VII. In Pyro's view, Smith's refusal to personally solicit a replacement constituted a failure on his part to cooperate with its efforts to accommodate him.

In *Dewey v. Reynolds Metal Co.*, 429 F.2d 324 (6th Cir.1970), *aff'd by an equally divided Court*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971),[2] this court held that an employer did not violate Title VII by discharging an employee who refused to work on Sunday and also refused to arrange a shift swap on the grounds that to do so would have been a sin. The court concluded that to accede to Dewey's demands that he neither be required to work on Sundays nor find a replacement would require the employer to impermissibly discriminate against other employees.[3]

The facts of *Dewey* and the instant case are quite similar, and at first glance it would appear that, as Pyro suggests, *Dewey* should control the disposition of this appeal. However, we believe that there is good reason for us not to follow *Dewey* in this instance. *Dewey* was decided by this court in 1970 and affirmed by a divided Supreme Court the following year. In 1972, Congress amended Title VII, and added subsection (j), which provides that employers must attempt to reasonably accommodate the religious needs of their employees, absent undue hardship. Prior to the enactment of this subsection, Title VII itself contained no requirement that employers make such an attempt. Title VII, as enacted in 1964, prohibited religious discrimination in employment, but went no further. The question of the necessity for accommodation was left to the Equal Employment Opportunity Commission. In its original regulations the EEOC stated that an employer had an obligation to accommodate the religious practices of its employees unless such an accommodation would create "a serious inconvenience to the conduct of the business." 29 C.F.R. § 1605.-1(a)(2)(1967). However, the regulations also allowed an employer to adopt any work week schedule generally applicable to all employees, without regard to or accommodation of an employee's religious needs. *Id.* §§ 1605.1(a)(3), (b)(3). The EEOC subsequently revised these regulations and stated that Title VII included "an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees ... where such an accommodation can be made without undue hardship on the conduct of the employer's business." 29 C.F.R. §§ 1605.1(b), (c) (1968).[4]

Some courts, including this one, were doubtful about whether the EEOC's interpretation of Title VII's requirements with regard to accommodation comported with Congress' intent.[5] However, when Congress amended Title VII in 1972, it added

---

**2.** An affirmance by an equally divided court is not entitled to precedential weight. *Neil v. Biggers*, 409 U.S. 188, 192, 93 S.Ct. 375, 378, 34 L.Ed.2d 401 (1972).

**3.** Judge Combs filed a strong dissent in which he noted that Dewey's refusal to seek a replacement himself "was grounded in his belief that working on Sunday is inherently wrong and that it would be a sin for him to induce another to work in his place. The replacement system was therefore no solution to Dewey's problem." 429 F.2d at 333.

**4.** Although the *Dewey* panel did consider this regulation in its opinion, it strongly indicated its belief that the regulation was unauthorized by Congress:

It should be observed that it is regulation 1605.1(b) and not the statute (§ 2000e–2(a)) that requires an employer to make reasonable accommodation to the religious needs of its employees. As we have pointed out, the gra-

vamen of an offense under the statute is *only* discrimination. The authority of EEOC to adopt a regulation interfering with the internal affairs of an employer, absent discrimination, may well be doubted.

429 F.2d at 331 n. 1 (emphasis in original).

**5.** In denying a petition for rehearing en banc in *Dewey*, the panel wrote that:

Nowhere in the legislative history of the Act do we find any Congressional intent to coerce or compel one person to accede to or accommodate the religious beliefs of another. The requirement of accommodation to religious beliefs is contained only in the EEOC Regulations, which in our judgment are not consistent with the Act.

....

To construe the Act as authorizing the adoption of Regulations which would coerce or compel an employer to accede to or accommodate the religious beliefs of all his employ-

the reasonable accommodation requirement, thereby explicitly adopting the EEOC's interpretation of Title VII.[6] Following the 1972 amendment, courts could no longer dispute that Title VII mandated reasonable accommodation. *See Hardison*, 432 U.S. at 74, 97 S.Ct. at 2271. Therefore, given the significant change in the law since our decision in *Dewey*, we consider the issue now before us anew.[7]

Undoubtedly, one means of accommodating an employee who is unable to work on a particular day due to religious convictions is to allow the employee to trade work shifts with another qualified employee. Other circuits have held that when an employer allows such a trade, it has reasonably accommodated its employee. *See, e.g., Brener*, 671 F.2d at 146; *Albuquerque*, 545 F.2d at 114. Pyro urges us to follow *Brener* and *Albuquerque* and hold that its policy of allowing its employees to trade shifts was a reasonable accommodation of Smith's religious beliefs. We decline to do so because the instant case is readily distinguishable from *Brener* and *Albuquerque*. Neither of the employees in those cases had any religious objection to arranging a

shift swap for himself. In the instant case, however, Smith clearly believes that it would be a sin to ask someone to work for him on Sunday. Therefore, the question now before us is whether an employer reasonably accommodates an employee by allowing the employee to arrange a shift trade himself when the employee considers it a sin to arrange such a swap.

■ We think it clear that if Smith had no religious qualms about asking others to work the Sundays he was scheduled to work, then Pyro's proposed accommodation would have been reasonable. However, where an employee sincerely believes that working on Sunday is morally wrong and that it is a sin to try to induce another to work in his stead, then an employer's attempt at accommodation that requires the employee to seek his own replacement is not reasonable. We therefore agree with the district court that Pyro has not met its obligation under Title VII.[8] Since the accommodation proposed originally by Pyro was not reasonable, Pyro was obligated to make further attempts at accommodating Smith, unless such attempts would pose an undue hardship.[9] We now turn to the

ees would raise grave constitutional questions of violation of the Establishment Clause of the First Amendment.
429 F.2d at 334. Clearly, the panel was of the view that to require an employer to accommodate the religious needs of its employees would be contrary to the law. However, reasonable accommodation is now precisely what the law requires. As Justice White noted in writing for the majority in *Hardison*, "[c]learly, any suggestion in *Dewey* that an employer may not be required to make *reasonable* accommodation for the religious needs of its employees was disapproved by § 701(j)...." 432 U.S. at 75 n. 9, 97 S.Ct. at 2272 n. 9 (emphasis in original).

6. Some courts have expressed the view that the 1972 amendment defining religion was added as a direct response to this court's decision in *Dewey*. *See Cooper v. General Dynamics*, 533 F.2d 163, 167 (5th Cir.1976); *Riley v. Bendix Corp.*, 464 F.2d 1113, 1116–17 (5th Cir.1972) (discussing legislative history of the amendment). The relevant legislative history supports this conclusion. *See* 118 Cong.Rec., §§ 227–53 (1972).

7. The dissent contends that the majority opinion "summarily overrules the precedent of *Dewey*" and ignores this circuit's tradition that reported panel opinions are binding upon subsequent panels. We disagree with these characterizations of the majority opinion. We neither

overrule binding precedent nor ignore circuit tradition. The binding effect of *Dewey* was undermined by Congress, not by this panel. As a court of law we are bound to interpret and apply the law that exists when we decide a case. When intervening changes in the law have proved prior precedent to be incorrect, a subsequent panel is not bound to continue following the disapproved precedent. Such blind allegiance is both unwise and unwarranted.

Congress has spoken, and in doing so it has signalled that our decision in *Dewey* seventeen years ago is no longer good law. We are bound to follow the dictates of Congress. We do not overrule binding precedent in doing so. Instead, we merely revisit the issue considered in *Dewey* and resolve it in accordance with current law.

8. We note parenthetically that Pyro obviously did not attempt a reasonable accommodation of Smith's religious beliefs on the first Sunday of its new schedule because *all* employees were required to report to work on that day. Therefore, a shift swap would have been difficult or impossible to arrange.

9. Contrary to the assertion in the dissent, the majority opinion does not impose the entire burden of accommodation on the employer. A cursory examination of the majority opinion

question of whether alternate attempts at accommodating Smith would have constituted undue hardship for Pyro.[10]

## IV.

In the district court, Pyro argued that any further attempt at accommodating Smith beyond allowing him to arrange a shift swap would present undue hardship. The court rejected this claim and found that arranging a shift swap for Smith would not have constituted undue hardship for Pyro. The court concluded that:

> It was the testimony at trial that there were twenty men that could have swapped with the plaintiff. The company had a monthly newspaper that was distributed to the men. Bulletin boards were available in the bathhouses and in the mine offices and the employer handbook admonished the men to read and scan these boards daily for important notices. The company had a personnel department. Surely there would have been no undue hardship to the company had it simply posted a notice on the bulletin boards or in the company paper that the company was looking for someone willing to swap shifts with the plaintiff. It was apparent to this Court that from the testimony and demeanor of the defendant's witnesses at trial that Pyro had no real desire to accommodate Smith's religious beliefs and flat out refused to lend him any significant assistance.

App. at 204. On appeal Pyro asserts that the district court's conclusion that it failed to establish undue hardship is clearly erroneous. We disagree. We find it difficult to see why soliciting replacements for Smith would have been an undue hardship for Pyro. The record indicates that prior to switching to the new eight-day work week, Pyro had a policy of communicating or advertising the fact that an employee needed to trade shifts, and the company took an active role in contacting employees to participate in shift trades. Pyro had the mechanism in place for soliciting replacements—namely the monthly newspaper and the bulletin boards. Pyro could have reasonably accommodated Smith by simply placing a notice in the newspaper or on a bulletin board that a replacement was needed for him. Pyro failed to meet its burden of establishing that such an accommodation of Smith's religious convictions would be an undue hardship.[11]

## V.

For the reasons set forth in this opinion, the judgment of the district court is AFFIRMED.

KRUPANSKY, Circuit Judge, dissenting.

This circuit decided this case on July 30, 1970 under the style of *Dewey v. Reynolds Metals Co.*, 429 F.2d 324 (6th Cir.1970). It denied rehearing en banc on August 11,

---

clearly indicates that it is entirely in tune with current law which requires the employee to bear some of the burden of accommodation. Nowhere do we suggest that the entire burden of accommodation may be placed on the employer. Indeed, we agree with the dissent's statement that "it is well established that an employee is not invested with an absolute right to demand an accommodation on his own terms." All that the law allows an employee to demand is a *reasonable* accommodation.

**10.** The dissent claims that our consideration of this issue is misconceived. This contention would be accurate only if Pyro had attempted to reasonably accommodate Smith's religious beliefs. The Supreme Court has noted that "the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." *Philbrook*, 107 S.Ct. at 372. The record supports the district court's finding that Pyro did not offer

Smith a reasonable accommodation. Consequently, the issue of undue hardship is properly joined.

**11.** Because we conclude that by attempting to arrange a shift swap for Smith Pyro would have reasonably accommodated his religious needs without incurring undue hardship, we need not decide whether other means of accommodation, such as transferring Smith to a surface job, running the Sunday shifts he was scheduled to work shorthanded, or allowing him to work additional days in excess of his regular shift without overtime pay to make up the Sunday absences, would pose undue hardship. We do note, however, that the Supreme Court in *Philbrook* explicitly states that any reasonable accommodation satisfies an employer's obligation. 107 S.Ct. at 372. Thus, an employer faced with more than one means of reasonably accommodating an employee is free to choose amongst these means and select the one that poses the least hardship.

**1090**

1970 and the Supreme Court affirmed the decision by an equally divided court during its October term of the same year.[1] *Dewey v. Reynolds Metals Co.*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). The law of the case in *Dewey* is, accordingly, existing precedent in this circuit.

The *Dewey* court, like the instant court, was confronted with a religious discrimination charge arising as a result of Dewey's refusal to work on his Sabbath, coupled with his refusal to arrange for an authorized replacement because he perceived his effort to induce another to work in his stead as a sin. The *Dewey* court, in considering the plaintiff's refusal to work on his Sabbath, and his refusal to seek a replacement because it constituted a sin concluded in clear and concise language that the employer had satisfied its duty of "reasonable accommodation to the religious needs of its employees when it permitted Dewey, by the replacement system, to observe Sunday as his Sabbath." *Dewey*, 429 F.2d at 331.

The majority disposition summarily overrules the precedent of *Dewey* for the following reasons:

1. Congress amended Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et. seq.* (Title VII or Act) in 1972, and added subsection 701(j), 42 U.S.C. 2000e(j), which provides that employers must attempt to reasonably accommodate the religious needs of their employees, absent undue hardship; and

2. Prior to the enactment of subsection 701(j), Title VII, as enacted in 1964, imposed no requirement upon an employer to accommodate the religious needs of its employees. *See* at 1086–1087.

Because it is the tradition of this circuit that reported panel opinions are binding upon subsequent panels and all issues decided therein become the law of the circuit and may not be overruled by another panel, because the resolution of the majority directly conflicts with the prior existing Sixth Circuit precedent enunciated in *Dewey*, be-

cause the majority rationalizes its definition of religious belief within a purely subjective environment, and because the majority erroneously imposes upon the employer the *entire burden* of reasonably accommodating every religious preference of its employees in a manner prescribed by or acceptable to the employee, I must respectfully dissent.

The continuing viability of *Dewey* as legal precedent within this circuit is memorialized in its explicit reasoning and uncomplicated conclusions. A review of *Dewey* discloses that the charged religious discrimination occurred on September 11 of 1966, at which time, Title VII imposed no duty upon an employer to reasonably accommodate the religious needs of its employees absent undue hardship. At the time of the events reported in *Dewey*, § 703(a)(1) of the Act, in broad and general terms, made it unlawful for employers to discriminate against employees on the basis of religion. Implementation of the congressional mandate had been delegated to the Equal Employment Opportunity Commission (EEOC) through its rulemaking authority.

The EEOC guidelines in effect at the time of Dewey's charged discrimination provided in pertinent parts as follows:

Section 1605.1 Observance of Sabbath and religious holidays.—(a)(1) Several complaints filed with the Commission have raised the question whether it is discrimination on account of religion to discharge or to refuse to hire a person whose religious observances require that he take time off during the employer's regular work week. These complaints arise in a variety of contexts, but typically involve employees who regularly observe Saturdays as the Sabbath or who observe certain special holidays during the year.

\*   \*   \*   \*   \*   \*

(2) The Commission believes that the duty not to discriminate on religious grounds includes an obligation on the

---

**1.** Although the judgment entered by an equally divided Supreme Court in *Dewey* is not "entitled to precedential weight" in other circuits, it is, nevertheless, significant precedent within this circuit.

part of the employer to accommodate the reasonable religious needs of employees and, in some cases, prospective employees where such accommodation can be made without serious inconvenience to the conduct of the business.

. * * * * * *

(3)(b)(3) The employer may prescribe the normal workweek and foreseeable overtime requirements, and absent an intent on the part of the employer to discriminate on religious grounds, a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs.

29 C.F.R. § 1605.1(a)(1), (2), (3)(b)(3) (effective June 15, 1966).

Effective July 10, 1967, the EEOC guidelines were amended by eliminating subsection (3)(b)(3) in its entirety and by revising subsection (2) to read:

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

29 C.F.R. § 1605.1(b) (1967).[2]

It is apparent that the substance of subsection (b) of 29 C.F.R. § 1605.1 as amended in 1967 was identical to subsection (2) of 29 C.F.R. 1602.2 of the original 1966 guide-

line. The thrust of both the 1966 and 1967 guidelines was and continues to be the obligation of the employer to accommodate the religious needs of its employees where such accommodations could or can be accomplished without undue hardship on the conduct of the employer's business.

In June of 1969 the *Dewey* trial court, having ignored the 1966 EEOC guidelines in effect on September 11, 1966, the date of Dewey's discharge, entered judgment in his favor after retroactively applying the 1967 amendment.

Upon appellate review, a panel of this circuit reversed the trial court and entered judgment for the employer. Its decision noted that the 1966 EEOC Regulation § 1605.1(a)(3) and (b)(3) had limited any obligation imposed upon the employer to accommodate the reasonable religious needs of its employees. *Dewey*, 429 F.2d at 329–30. The panel initially observed that, in its opinion, "it would have been more appropriate for the District Court to have applied the EEOC Regulation § 1605.1 which was in force at the time of Dewey's discharge, and which became effective June 15, 1966," *id.* at 329, and since the employer had provided a fair, uniform and equitable method of distributing the heavy workload among the employees without discriminating against any of them, it had not intentionally engaged in any unlawful employment practice in violation of Title VII of the Act or the EEOC guidelines. The panel thereupon proceeded to consider Dewey's right to invoke the accommodation requirements of both the 1966 and 1967 EEOC guidelines.

The panel observed that the 1967 EEOC guideline omitted § 1605.1(b)(3), in its entirety, which had provided:

(3) The employer may prescribe the normal workweek and foreseeable overtime requirements, and absent an intent

2. There is some confusion in the citations to the EEOC guidelines and their respective effective dates. In *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), and in the majority opinion, the original EEOC enactment addressing the duty of the employer to accommodate the religious convictions of its employees which became effective

on June 15, 1966 has been cited as 29 C.F.R. § 1605.1 (1967); the amended version of that regulation has been cited as 29 C.F.R. § 1605.1 (1968) although its effective date was July 10, 1967. For purposes of the dissent each regulation has been cited by referring to its actual effective date.

on the part of the employer to discriminate on religious grounds, *a job applicant or employee who accepted the job knowing or having reason to believe that such requirements would conflict with his religious obligations is not entitled to demand any alterations in such requirements to accommodate his religious needs.*

29 C.F.R. § 1605.1(b)(3) (emphasis added).

The panel reasoned that it was undisputed by the parties that Dewey had entered the employ of Reynolds before he acquired his religious beliefs and before his employer had entered into its collective bargaining agreement which required all employees to work overtime. Accordingly, the *Dewey* panel, in the first instance, decreed that, pursuant to the 1966 EEOC guideline in force at the time of Dewey's discharge, his employer was under no obligation to accommodate his religious convictions because Dewey knew or had reason to believe that the work assignments approved by the collective bargaining agreement would conflict with his subsequently acquired religious needs.

The panel went on to decide, in the alternative, that in the event that Dewey's after acquired religious convictions were entitled to be reasonably accommodated under subsection (a)(2) of § 1605.1 of the 1966 EEOC guidelines:

his employer did endeavor to make accommodation to the religious beliefs of its employees by interpreting the agreement so as to permit any employee assigned to overtime to be relieved from the assignment simply by arranging for another qualified employee to replace him. We hold that this was a reasonable accommodation.

*Dewey*, 429 F.2d at 335.

Subsequent to having considered and disposed of the controversy pursuant to the 1966 EEOC guidelines, the *Dewey* panel proceeded to consider the issues presented by applying § 1605.1(b) of the 1967 EEOC amendment to its guidelines that had been the anchor of the trial court's resolution. The panel opinion, in a direct unequivocal passage, stated:

But even if the 1967 regulations are applied, we think that Reynolds complied with Section 1605.1(b) thereof by making a reasonable accommodation to the religious needs of its employees when it permitted Dewey, by the replacement system, to observe Sunday as his Sabbath. He stubbornly refused to exercise this privilege. The finding of the District Court that Reynolds did not make reasonable accommodations to the religious needs of Dewey is not supported by substantial evidence and is clearly erroneous.

*Dewey*, 429 F.2d at 331 (footnote omitted).

To summarize the *Dewey* disposition, the panel concluded that:

1. The trial court should have applied the 1966 EEOC guidelines that were in effect when Dewey was discharged;

2. There was no duty imposed upon the employer by the 1966 EEOC guidelines to reasonably accommodate Dewey's religious convictions because he knew or had reason to believe that the requirements of the existing collective bargaining agreement would conflict with his subsequently acquired religious beliefs;

3. Even if Dewey's after acquired religious beliefs were entitled to be reasonably accommodated by subsection (a)(2) of Section 1605.1 of the 1966 EEOC guidelines, his employer's replacement program constituted a reasonable accommodation of his religious beliefs since the replacement program satisfied the mandate of the regulation;

4. Even if Dewey's charges were considered pursuant to Section 1605.1(b) of the 1967 amendment, his religious needs had been reasonably accommodated, as noted above.

The *Dewey* panel's precedential declarations that the employer had satisfied its duty to reasonably accommodate the religious needs of Dewey by the standards of *either* the original or amended versions of EEOC guidelines where it had authorized a voluntary replacement program as an alternate procedure for working on Sabbath, even under circumstances where the em-

ployee refused to exercise the privilege because he believed that to do so would be a sin, constituted the law of the case. The panel's observations pioneered the definition of the terms "reasonable accommodation" and "undue hardship," which terms had not been defined in either the 1966 or 1967 EEOC guidelines or by Title VII of the 1964 Civil Rights Act or its 1972 congressional amendment. *Dewey v. Reynolds Metals Co.*, 429 F.2d 324, 331 (6th Cir.1970), *aff'd by an equally divided court*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971).

It is apparent from the *Dewey* decision that the panel's primary concern with the 1967 amendment of 29 C.F.R. § 1605.1 was the elimination of subsection (3)(b)(3) which significantly limited the employer's duty to reasonably accommodate the religious convictions of employees and the trial judge's retroactive application of the amendment. It is equally apparent that the panel was not concerned with, but rather accepted, the administrative mandate addressing the employer's duty to reasonably accommodate the religious needs of employees which had been incorporated into both the 1966 and 1967 versions of the regulation since the panel considered and decided the case by parallel, but independent, applications of both the 1966 and 1967 models of the rule. The substance of the decision and its precedential impact has withstood the passage of time and the critical scrutiny of legal commentators and remains intact, having received the affirmative endorsement of the Supreme Court in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

It is true that the *Dewey* decision attracted widespread legal notoriety subsequent to its publication. The attention was, however, prompted by the panel's casual observations as to an issue that it did not decide. In a post hearing addendum to its decision, issued subsequent to a vote of the entire court denying en banc reconsideration, the panel, after reaffirming its original reasoning, suggested that a construction of Title VII approving the adoption of regulations which compelled an employer to accede to or reasonably accommodate the religious beliefs of all of his employees could be offensive to the Establishment Clause of the First Amendment. The comment had no bearing or impact whatsoever upon the panel's enunciated law of the case. The comment did, however, stimulate debate among legal commentators and the judiciary of other circuits, and was interpreted by Congress as implicating an abuse of administrative rulemaking authority that enlarged the scope of Title VII beyond the congressional intent of the 1964 Act. To allay any doubt as to the scope of authority delegated to the EEOC to formulate guidelines imposing a duty upon employers to reasonably accommodate the religious convictions of its employees, Congress promulgated the 1972 § 701(j) amendment to the Act, which essentially incorporated the very language of the "reasonable accommodation" provisions that appeared in both the 1966 and 1967 EEOC Regulations. Although the 1972 congressional amendment of the Act may be construed as an enlargement of Title VII, the substance of the change merely imputed legislative recognition of EEOC administrative mandates that had been effectively implemented by courts from as early as June 15, 1966, the legislative enlargement by the § 701(j) amendment did not warrant overruling the case law enunciated by the *Dewey* panel for reasons recognized by the Supreme Court in *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), and reviewing legal scholars.

The singular purpose of the § 701(j) amendment to the Act was to justify the EEOC formulation of the reasonable accommodation requirement that had been an integral element of both the 1966 and 1967 guidelines.[3] *Riley v. Bendix Corp.* 464 F.2d 1113, 1116–17 (5th Cir.1972).

---

3. Remarks of Senator Randolph who sponsored the amendment as memorialized in the Congressional Record clearly reflect the congressional intent:

> I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State or local governments. Unfortunately, the courts have, in a sense, come down on both sides of the issue. The Supreme Court of the United States, in a case involving

In 1977, the Supreme Court, upon revisiting *Dewey*, interpreted the § 701(j) amendment of the Act as congressional imprimatur of the EEOC's rulemaking authority to impose upon the employer a duty of reasonable accommodation. The Court's review comports favorably with the analysis of this dissent. After reflecting upon the evolution of both the 1966 and 1967 EEOC guidelines, the Court observed:

> The EEOC did not suggest what sort of accommodations are "reasonable" or when hardship to an employer becomes "undue."

> This question—the extent of the required accommodation—remained unsettled when this Court, in *Dewey v. Reynolds Metals Co.*, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), affirmed by an equally divided Court the Sixth Circuit's decision in 429 F.2d 324 (1970). The discharge of an employee who for religious reasons had refused to work on Sundays was there held by the Court of Appeals not to be an unlawful employment practice because the manner in which the employer allocated Sunday work assignments was discriminatory in neither its purpose nor effect; and consistent with the 1967 EEOC guidelines, *the employer had made a reasonable accommodation of the employee's beliefs by giving him the opportunity to secure a replacement for his Sunday work.*

*Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 73, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977) (emphasis added) (footnotes omitted).

Moreover, in footnote 8 of the *Hardison* opinion, the Court explained that:

> The conduct alleged to be an unlawful employment practice [in *Dewey*] occurred prior to the promulgation of the 1967 guidelines, and the Court of Appeals expressed the view that those guidelines should not be given retroactive effect. Also, an earlier ruling by an arbitrator was held to have conclusively resolved the religious discrimination question in favor of the employer. Finally, the employer in *Dewey* was not excused from a duty to accommodate; *the Court of Appeals simply held that the employer had satisfied any obligation that it might have had under the statute.*

*Hardison*, 432 U.S. at 73 n. 8, 97 S.Ct. at 2271 n. 8 (emphasis added) (citation omitted).

In sum, any suggestion that the EEOC lacked authority to impose upon employers the duty to reasonably accommodate the religious needs of its employees was put to rest by the 1972 § 701(j) amendment to the Act. However, neither Congress nor the EEOC have suggested that "reasonable accommodation" requires an employer to do more than was done in *Dewey*, apparently having preferred to leave that issue open for resolution by the courts. *Hardison*, 432 U.S. at 74 n. 9, 97 S.Ct. at 2272 n. 9. Thus, the employer's sole obligation to make reasonable accommodations for the religious observations of its employees, short of incurring undue hardship, is presently clear, but the reach of that obligation has never been spelled out by either Congress or the EEOC. This Circuit's decision in *Dewey* was a first effort to fill the void by declaring that an employer had discharged its duty to reasonably accommodate the religious needs of Dewey by the standards of the 1967 EEOC guidelines where it had authorized a voluntary replacement program as an alternate procedure for working on his Sabbath, even under circumstances where the employee refused to exercise the privilege because he sincerely believed that to do so would be a sin. That pronouncement, which identified but one course of action by which an employer could satisfy its duty to accommodate, has remained unquestioned and intact to this date and has been adopted by a

---

the observance of the Sabbath and job discrimination, divided evenly on this question.

This amendment is intended, in good purpose, to resolve by legislation—and in a way I think was originally intended by the Civil Rights Act—that which the courts apparently

have not resolved [the authority of the EEOC to promulgate the rules imposing upon the employer the duty to reasonably accommodate].

118 Cong.Rec. 705–06 (1972).

consensus of the circuits that have addressed the issue. The instant case falls within the four corners of the *Dewey* decision.

Danny R. Smith (Smith), the plaintiff herein, was employed by Pyro Mining Company (Pyro), the defendant, as a mechanic responsible for repairing equipment in an underground coal mine from June 19, 1981 to August 23, 1982. Smith's presence on his crew was necessary to ensure the safety, efficiency and effectiveness of his unit. All mechanics such as Smith, who performed electrical work, were required to be certified electricians. Pyro was not permitted, by federal regulations, to operate a mine unit without a mechanic. Consequently, when a mechanic was absent from his job assignment, another qualified employee with contemporaneous duties was required to be substituted for the absent employee thereby compromising the production and safety of the mining unit's operation. Pyro maintained a uniformly enforced policy of terminating any employee having three unexcused absences in a six month period.

Smith, at all times material to this action, was a member of and a Sunday school teacher at the Independent Baptist Church of Cedar Hill, Kentucky. Although his church had no tenets against gainful Sunday employment, Smith asserted that he perceived his religious obligations as prohibiting him from working on his Sabbath, i.e., Sunday between the hours of 12:00 a.m. Saturday to 12:00 a.m. midnight Sunday.

On June 11, 1982, Pyro initiated an eight (8) day work week for production personnel employed in the mine where Smith was assigned. Under this schedule, employees were assigned to work for four (4) consecutive ten (10) hour days out of eight (8)— four (4) days on then four (4) days off. Of the eight-day work week, employees were scheduled to work some, but not all, Sundays during the year. Prior to instituting the eight-day work week, Pyro operated a three-shift daily schedule. Most mechanics worked either a five-day work week [Monday through Friday], or a six-day work week [Monday through Saturday]. A few mechanics worked seven days a week.

Smith occasionally worked the 11:00 p.m. Sunday night shift.

Prior to implementing the eight-day work week, Pyro advertised, through a video presentation, its policy of authorizing employees who objected to working on a Sabbath to trade or swap scheduled shifts with another qualified employee who was not also scheduled to work the same shift. Smith acknowledged that it was his responsibility to find a replacement if he did not desire to work on any Sunday.

In addition to the voluntary replacement program implemented by Pyro, it had an "open-door policy" whereby any employee who professed a work-related grievance or other problem could, in sequence, present the matter, first to his supervisor then up through channels to and including the president of the company for consideration and resolution. Smith had been furnished with a handbook explaining Pyro's open-door policy before it implemented its eight-day work week. Thus, it was common knowledge that when scheduled job shift assignments conflicted with religious observances, employees were initially required to arrange for a replacement by another qualified employee. In the event that the employee was unsuccessful in arranging for his replacement, the employee was required to exhaust his remedies afforded by Pyro's open-door policy.

Smith was scheduled to work on both Sunday, July 11, 1982 and Sunday, August 15, 1982. He did not attempt to arrange a shift trade for either day. Rather, Smith telephoned Pyro on both scheduled Sundays and reported that he would be absent from work because he was attending church. Smith was assessed unexcused absences for both days.

Smith was scheduled to work on Sunday, August 15, 1982. In an effort to resolve Smith's conflict, David Dunbar (Dunbar), Smith's immediate supervisor, attempted to have his son, who was also employed by Pyro as a mechanic, replace Smith on his assigned August 22, 1982 work schedule. Dunbar's son was not available as a replacement for Smith on Sunday, August 22, 1982. Between August 15, 1982 and Au-

gust 22, 1982, Smith made inquiry of only two of twenty qualified employees who worked shifts other than his to replace him so that he could observe his Sabbath. Both attempts were unsuccessful. Thereafter, Smith refused to request any employee to exchange shifts with him because he had concluded that it was improper for him to seek a replacement.

On August 22, 1982, Smith again notified Pyro that he would not report for work because he was attending church services. Smith was assessed a third unexcused absence for missing work on August 22, 1982 and, was accordingly, terminated on September 11, 1982 for having three unexcused absences in a six-month period.

As in *Dewey*, Pyro maintained neutral employment policies and practices that were uniformly applied. Under its rotating work week, every underground miner was scheduled to work essentially an equal number of Saturdays and some Sundays. No employee was required to bear more than his or her fair share of weekend work and no employee was required to work every Sunday or other Sabbath. The uniform and equitable allocation of off days resulting from Pyro's rotating shift assignments "represented a significant accommodation to the needs, both religious and secular, of all of [Pyro's] employees." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 78, 97 S.Ct. 2264, 2274, 53 L.Ed.2d 113 (1977). Accordingly, Pyro's eight-day work week satisfied the non-discriminatory mandate of Title VII.

As in *Dewey*, Pyro authorized a replacement program that permitted Smith the opportunity to accommodate his religious convictions if he elected to do so. As in *Dewey*, Smith refused to exercise the privileges of reasonable accommodation authorized by Pyro claiming that to do so would be inducing a third party to sin. Moreover, Smith refused to pursue and exhaust the remedies provided by Pyro's open door policy which had been inaugurated to resolve differences such as that posed by Smith's religious beliefs. Accordingly, pursuant to the pronouncements of *Dewey*, the employer, Pyro, satisfied its reasonable duty to accommodate Smith's religious beliefs and was therefore justified in discharging him.

Accordingly, I would respect the longstanding tradition of this court and follow this court's prior decision in *Dewey*.

As in *Dewey*, the Fifth and Tenth Circuits have recognized that the implementation of a flexible scheduling system which permits employees to arrange replacements with other qualified co-workers satisfies the employer's duty of reasonable accommodation. *Brener v. Diagnostic Center Hosp.*, 671 F.2d 141 (5th Cir.1982); *United States v. City of Albuquerque*, 545 F.2d 110 (10th Cir.1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977). The majority seeks to avoid the pronouncements of those legal precedents by factually distinguishing those decisions from the instant litigation.

Consistent with *Brener* and *Albuquerque*, the majority has acknowledged that the implementation of a neutral shift trade policy constitutes a reasonable accommodation of employee religious convictions. *See* at 1088. Nonetheless, the majority reasons that, in the instant case, Pyro's policy was not a reasonable accommodation because Smith had a sincere religious belief which prevented him from seeking another person to work in his stead.

Thus, the primary issue, more properly framed, confronted by this court is not one of sincerity, but rather a definition of a *religious belief*. Unfortunately, neither the Supreme Court nor the EEOC guidelines have afforded direction in defining the phrase as it is employed within the context of Title VII congressional or agency pronouncements addressing the term.

The purely subjective test adopted by the majority to fill the congressional hiatus, investing carte blanche discretion in the employee to bring virtually any personal belief within the protection of 42 U.S.C. 2000e(j) by merely characterizing it as a *religious belief*, is fraught with wide ranging hazardous economic and commercial consequences.

I would suggest that a more appropriate standard against which the term *religious belief* should be judged is the objective test applied by the Supreme Court in *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32

L.Ed.2d 15 (1972), to identify a particular practice or belief as one to be afforded constitutional protection under the Free Exercise Clause of the First Amendment. In *Yoder*, the Supreme Court observed that, in order to qualify "a 'religious' belief or practice entitled to constitutional protection," an alleged belief must not be "merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." 406 U.S. at 215–16, 92 S.Ct. at 1533. Mere personal preferences or interpretations do not constitute "religious" beliefs because the "very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." *Id.* It would appear that *Yoder*'s definition of *religious beliefs* is equally applicable in the Title VII context. *McCrory v. Rapides Regional Medical Center*, 635 F.Supp. 975, 979 (W.D.La.), *aff'd mem.*, 801 F.2d 396 (5th Cir.1986); *McGinnis v. United States Postal Serv.*, 512 F.Supp. 517, 520 n. 2 (N.D.Cal.1980); *Brown v. Pena*, 441 F.Supp. 1382, 1384–85 (S.D.Fla.1977), *aff'd mem.*, 589 F.2d 1113 (5th Cir.1979); *see also* 118 Cong.Rec. 705–06 (1972) ("I think in the Civil Rights Act we thus intended to protect *the same rights* in private employment *as the Constitution protects* in Federal, State or local governments.") (statement of Sen. Randolph) (emphasis added).

If construed as more than a pretextual *post hoc* justification for his failure to implement company policy, Smith's alleged belief that he could not seek another to work in his stead must be considered a mere personal preference not entitled to the statutory protection set forth in 42 U.S.C. § 2000e(j). Having conceded that the tenets of his religion did not forbid him from working on his Sabbath and that he had not attempted to arrange for a replacement prior to his unexcused absences on July 11 and August 15, 1982, Smith testified that, only after he had twice been rejected by individuals who also preferred not to work on Sunday, August 22, 1982, "it came to me that if I was asking somebody else to work for me, I would be asking them to sin for me; and it wasn't right

if I asked somebody to do something that I couldn't do; and I just didn't ask nobody else after that." He further attested that his personal religious perceptions would not have been offended if the company arranged for his replacement; however, he was unable to reconcile this apparent conflict with his assertion that it was improper for him to seek a replacement because he would be asking his replacement, whomever it would be, to sin because, according to Smith's perceptions, it was a sin for anyone to work on his, Smith's, Sabbath.

In light of the foregoing concessions, Smith's testimony belies the conclusion that his refusal to participate in the company's authorized replacement program was predicated upon a belief "of deep religious conviction, shared by an organized group, and intimately related to daily living." *Yoder*, 406 U.S. at 216, 92 S.Ct. at 1533. The fact that Smith's miraculous revelation did not appear until he had been twice rejected in seeking a replacement reflected that his convenient revelation may not have been totally the product of a deeply held religious conviction. Moreover, the record is devoid of any evidence that Smith's refusal to implement company policy was predicated upon a belief which was shared by other members of his religious sect.

Accordingly Smith's belief that he could not ask other employees to work in his stead does not appear to come within the definition of a "religious" belief protected by 42 U.S.C. § 2000e(j). Although Pyro had a duty to accommodate Smith's sabbatarian practices, it was under no obligation to satisfy Smith's purely subjective personal preference for a company arranged shift trade. In light of the foregoing, I find the majority's effort to distinguish *Brener* and *Albuquerque* unpersuasive and would apply the reasoning and conclusions of those cases to the instant case.

I am also concerned by the far reaching implications of the majority's disposition. The majority suggests that, by labeling any purely subjective personal preference as a "religious" belief or practice, an employee may effectively shift the entire burden of accommodation onto the employer.

However, it is well established that an employee is not invested with an absolute right to demand an accommodation on his own terms. Title VII "does not require employers to accommodate the religious practices of an employee in exactly the way the employee would like to be accommodated. Nor does Title VII require employers to accommodate an employee's religious practices in a way that spares the employee any cost whatsoever." *Pinsker v. Joint School District No. 28J*, 735 F.2d 388, 390–91 (10th Cir.1984) (citing *Brener*, 671 F.2d at 145–46); *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978). Moreover, an employer is not required to bear more than a *de minimis* cost in order to accommodate his employees' religious beliefs. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84, 97 S.Ct. 2264, 2277, 53 L.Ed.2d 113 (1977).

In *Ansonia Bd. of Educ. v. Philbrook*, —— U.S. ——, ——, 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986), the Supreme Court clearly stated that an employer is not required to select an employee-preferred procedure to accommodate his employee's religious needs, but rather may satisfy its statutory duty of accommodation by implementing any one of many reasonable alternatives available to the employee:

We find no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation. The employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.

Thus, if the employer presents the employee with any accommodation that is reasonable, the employee must attempt to implement that accommodation, regardless of whether he would prefer some other course of action.

Finally, even the most cursory analysis of relevant Supreme Court precedent discloses that the majority's attempt to join the issue of undue hardship in the instant controversy is misconceived. As the Supreme Court declared in *Ansonia*, "the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship." *Ansonia*, —— U.S. at ——, 107 S.Ct. at 372. In the present case, Pyro has demonstrated that it had satisfied its duty of reasonable accommodation by implementing a neutral policy of permitting employees to arrange their own shift trades. Thus, Pyro was not required to prove that the alternative accommodations suggested by Smith would have resulted in undue hardship. *Ansonia*, —— U.S. at ——, 107 S.Ct. at 372.

For the reasons stated above, I would reverse the judgment of the district court and remand this matter for entry of judgment in favor of Pyro.