**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**BRIDGESTONE/FIRESTONE, INC., Defendant.**

**No. 98–CV–2036.**

United States District Court, C.D. Illinois, Danville/Urbana Division.

May 17, 2000.

---

sion ("EEOC") filed a complaint against Defendant Bridgestone/Firestone, Inc. ("Firestone"). The complaint alleges that Firestone discriminated against employees Jimmy Waddell and David Frazier on the basis of their religion in violation of Title VII. 42 U.S.C. § 2000e *et seq.* Both parties have moved for summary judgment. For the following reasons, the EEOC's Partial Motion for Summary Judgment (# 18) is DENIED, and Firestone's Motion for Summary Judgment (# 14) is GRANTED.

## BACKGROUND

The following facts are drawn from the parties' statements of undisputed facts and responses thereto, as well as the exhibits submitted in support of the motions. Firestone operates a tire-manufacturing plant in Decatur, Illinois. The plant produces about 25,000 tires a day. In doing so, it uses rubber compounds. Once processed, rubber cannot be stored indefinitely. Rather, it must be used within hours, and therefore it is essential to Firestone to have the right complement of employees in all departments and properly functioning machinery at all times. As a result, an imbalance in the workforce or problems with equipment can seriously undermine Firestone's production. Moreover, Firestone has hundreds of multi-million dollar machines in the plant that require significant maintenance and lubrication on a daily basis. Otherwise, the plant cannot meet its daily production goals.

Firestone's workers are represented by a union. On July 12, 1994, the workers went on strike, which lasted until May 1995. During the strike, Firestone hired a number of replacement workers. As a result, not all of the previous production positions were available once the strike ended. Firestone created a preferential hiring list, and workers were called back as positions became available. As the previously striking workers returned to the plant, they attended an orientation session

Jean P. Kamp, John C. Hendrickson, June Wallace Carson, Equal Employment Opportunity Commission, Chicago, IL, for Plaintiff.

Frances E. Prell, Burke, Weaver & Prell, Robert W. Vyverberg, Holland & Knight, L.L.P., Chicago, IL, for Defendant.

## ORDER

McCUSKEY, District Judge.

On February 12, 1998, the United States Equal Employment Opportunity Commis-

to advise them of the status of operations and certain new work rules and policies. Following the strike, the Terms & Conditions of Employment ("Terms & Conditions") governed the employment of hourly production workers. A Collective Bargaining Agreement ("CBA") went into effect in December 1996, and superseded the Terms & Conditions.

Before the strike, hourly production employees worked Mondays through Fridays in eight-hour shifts. Occasionally, they were required to work on a Saturday, but working a Sunday was always optional and earned overtime wages. Immediately after the strike, however, Firestone began operating on a continuous, rotating schedule. As a result, hourly employees worked twelve-hour shifts and were required to work every other weekend.

Firestone has a progressive, no-fault attendance policy, which it implemented with the Terms & Conditions and later incorporated into the CBA. Under Firestone's attendance policy, employees accumulate incidents for absences. Under the policy, three incidents in a six-month period results in a counseling session. Each additional incident within a year advances the employee one step further in the attendance program. Progressive discipline is imposed for each step, from a written warning, to a written reprimand, to a final written warning. After the seventh incident, Firestone's Human Resources Department conducts a review of the employee's entire attendance record and considers termination.

Waddell began working for Firestone as a tire builder in 1968. For many years, he was also a member and associate pastor of a local Baptist church. In October 1980, he became an ordained minister. From November 1996 until January 1998, he served as part-time pastor to a different congregation. In January 1998, he began to pastor full-time, a position in which intends to remain. For that work, he receives $600 a week, a housing allowance, and life insurance benefits.

As a Baptist, Waddell believes he must abstain from all physical labor on Sundays. Before the strike, Waddell worked a 3:00 p.m. to 11:00 p.m. shift Monday through Friday, and therefore never worked Sundays. However, once Firestone converted to a continuous operating schedule, it no longer had Monday through Friday tire-building shifts. Accordingly, when Waddell returned to work following the strike, he learned that Firestone would require him to work every other Sunday.

In June 1995, Waddell met with Firestone's Labor Relations Manager, Doug Floyd, to inquire about a religious accommodation so that he would not have to work on Sundays. Floyd told Waddell that he would look into a possible accommodation. In addition, on July 10, 1995, Waddell submitted a letter to his supervisor concerning his unwillingness to work Sundays. The supervisor passed the letter on to his Department Manager. The letter suggested that Firestone either allow Waddell to work one of his days off whenever he was scheduled for a Sunday, or allow him to transfer to another department to avoid working Sundays.

According to Firestone, there were no other tire-building jobs that would allow Waddell to avoid working Sundays. Firestone offered him the option of trading shifts with another employee, taking a leave of absence, or waiting to transfer to a different job once one became available. Waddell, however, did not want others to work for him because he believed that no one should perform physical labor on Sundays. Waddell believed that Firestone could simply make do with one less worker on Sundays, and then have an extra hand on those days he worked to make up for the missed shift.

Waddell ultimately missed his Sunday shifts and was disciplined under Firestone's attendance program. Waddell filed a grievance with the union, but Firestone continued its discipline. Eventually, Waddell faced termination. On September 28,

1995, to avoid termination, Waddell requested and received a leave of absence without pay. Firestone granted him three extensions on this leave of absence. During his leave, Waddell worked as an interim pastor at his church and may have worked at a local newspaper.

In February 1996, Firestone contacted Waddell about a position available at the warehouse. This position required him to work only Mondays through Fridays, from 7:00 a.m. until 3:00 p.m., but paid him considerably less that what he previously earned as a tire builder. Waddell accepted this position because he believed he had "no choice."

In July 1998, Waddell applied for a leave of absence to pursue "ministerial duties." Firestone granted this request. After ninety days, however, Firestone informed Waddell that it could not extend the leave. After using some vacation time he had accumulated, Waddell voluntarily retired from Firestone on November 30, 1998. He testified that he decided to retire because he "became pastor full-time and [he] could no longer work the eight hours at the plant and pastor." He retired with full benefits and collects a pension. He is not interested in returning to work at Firestone.

Frazier started working for Firestone in 1971. Before the strike, Frazier worked the 11:00 p.m. to 7:00 a.m. shift Mondays through Fridays as a tire builder. Frazier is a member of the Catholic church, and believes he should abstain from labor on Sundays.

Frazier returned to Firestone on March 13, 1996 following the strike. As a result of the plant's new production schedule, he was required to work every other Sunday. When he learned of this new requirement, he informed Firestone that his religious beliefs precluded him from working Sundays. Firestone informed Frazier that he could not work as a tire builder without working Sundays, and offered him a position in the warehouse. Although the warehouse position did not require him to work

Sundays, it paid much less than the tire builder position. Frazier reluctantly accepted this position.

Firestone's annual shift realignment occurs around Labor Day of each year. In August 1997, Frazier learned that there would be a realignment of the crew in his department. As a result of this realignment, Frazier no longer had sufficient seniority to continue working a Monday to Friday shift in the warehouse. At that time, there were no other jobs in the plant that he was qualified to perform and for which he had enough seniority to allow him to avoid working Sundays. Once the realignment was announced, Frazier's supervisors called him at home to discuss possible options to accommodate his religious beliefs. They intentionally put Frazier on the shift that would allow him the following Sunday off, so that they would have more time to figure out a solution.

On September 7, 1997, Frazier met with Firestone Human Resources and Labor Relations personnel. They discussed various options, such as shift-swapping, a transfer to the night shift, and the possibility of a transfer to the maintenance department. Frazier declined the night shift option because it would still require him to work Sundays, and therefore did not resolve the conflict. He also refused to swap shifts because he did not believe he could ask another to work his Sunday shifts.

On September 12, 1997, Frazier suggested to his supervisor that Firestone allow him to work Mondays following his otherwise scheduled Sundays. The supervisor discussed this suggestion with Firestone's Labor Relations Manager, Lou Sliepka, who responded to Frazier on September 26, 1997. Sliepka informed Frazier that Firestone would allow him to trade shifts with another employee and would also allow him to transfer to the night shift. He then invited Frazier to offer any additional suggestions he might have. Frazier again rejected Firestone's proposals. As a result, he missed several Sunday shifts and

Firestone began to punish him under its attendance policy.

At the end of September 1997, Firestone offered Frazier a lubricator position, which he accepted. The new position did not resolve the scheduling conflict, but paid considerably more than the warehouse position. Because Frazier spent the next few weeks training for his new position, he was not required to work the regular Sunday shifts. Eventually, however, Firestone scheduled him to work Sundays, and Frazier began to accumulate absences once again. Whenever Frazier missed work on Sundays, Firestone tried to cover his duties with overtime help or temporary assignments. If overtime help was not available, Firestone would ask the union to assist in instructing mechanics to work out of class. During that time, there was a heavy work load and lubricators were encouraged to work overtime. Frazier's absence on Sunday was covered by overtime seventy-five percent of the time.

When overtime help was unavailable to cover Frazier's absence on Sunday, Frazier would meet in advance with Randy Gordon, the second lubricator on his shift, to inform him of any problem areas on his route. Frazier's regular lubrication route included more than a hundred machines with thousands of individual lubrication points. It generally takes a significant portion of the shift for the lubricator to complete his route. Nevertheless, according to the EEOC, Gordon was able to adequately perform the lubricator duties in Frazier's absence. Firestone, however, asserts that Frazier's "absences on Sundays negatively impacted the maintenance and upkeep of the machinery in his area, particularly if Firestone could not fill his shift with overtime." Firestone asserts that "[i]n all cases when Mr. Frazier was absent on Sundays, work went undone."

Following an absence on Sunday, November 16, 1997, Frazier received a written reprimand. Frazier missed work the following week, and again on November 30, 1997. At this point, he was subject to termination. As a result, Frazier requested and Firestone granted a thirty-day unpaid leave of absence. The leave of absence allowed Frazier to avoid termination and continue to accrue seniority while waiting to see if the situation changed. Firestone extended Frazier's leave of absence three times through April 1998. While on leave, Frazier drove a truck for another employer. Although outside employment is not normally allowed under the CBA, Firestone did not challenge it in Frazier's case.

Eventually, Firestone informed Frazier that it would not extend his leave of absence further and ordered him to return to work. On April 13, 1998, Frazier met with Firestone managers and several union representatives. Firestone's Human Resources Manager, Richard Meyers, explained that Firestone needed to bring Frazier back to work, and would agree to wipe Frazier's attendance record clean if he returned to work.

Frazier agreed and on April 30, 1998, sent Meyers a letter suggesting five accommodations of his still pending religious conflict. Specifically, Frazier suggested that Firestone (1) assign him to a crew that works 7:00 a.m. to 3:00 p.m. Mondays through Fridays; (2) transfer him to a millwright position; (3) transfer him to a painter position; (4) let him work Mondays following his otherwise scheduled Sundays; or (5) credit him with thirty years experience and allow him to retire early with full benefits.

Representatives from Firestone's Human Resources, Labor Relations, and Plant Engineering Departments, as well as outside counsel evaluated Frazier's accommodation proposals. Firestone determined that Frazier's first proposal would violate the CBA, as well as the plant's negotiated work schedule. Firestone asserts that it could not create a special shift for one employee, and Frazier lacked sufficient seniority under the CBA to switch shifts.

Firestone rejected Frazier's second and third proposals as well. Frazier did not have the qualifications for either a millwright or a painter position. Besides, there were no openings for these positions at that time. Moreover, Firestone could not bypass the CBA to transfer one of its lubricants to another job classification where other employees were waiting for these positions to become available. Firestone also rejected Frazier's fifth proposal that Firestone allow him to retire early. To accept this proposal, Firestone asserts, it would have had to violate the CBA by adding service to Frazier's tenure.

As for the fourth proposal, Firestone believed that allowing Frazier to work the Mondays following his Sunday shift would be in effect creating a special, non-negotiated shift for him. Firestone asserts that if it created a special shift for Frazier and allowed him to work another day of the week instead of Sunday, another union member might file a grievance, for which Firestone may be responsible. Moreover, Firestone asserts, it would be forced to pay Frazier overtime whenever the extra shift meant he had worked more than forty hours that particular week. Finally, Firestone was concerned that it would be forced to operate one lubricator short on Sundays unless it filled the shift with an employee working overtime.

On May 15, 1998, Meyers sent Frazier a letter, which set forth Firestone's reasons for rejecting his five proposals. In this letter, Firestone not only repeated its offer to allow Frazier to swap shifts, but also offered to undertake the burden of finding another employee to swap so that Frazier would not have to do so. Once again, Frazier refused this option, and began to miss his Sunday shifts. As a result, he progressed under the attendance policy, and eventually received a final written warning. Although Frazier often made up the hours he missed on his day off, Firestone asserts that this did not make up for the loss in productivity it suffered on the Sundays Frazier was absent. Moreover,

Firestone had to pay Frazier overtime wages whenever the extra shift put him over forty hours for that particular week.

On July 22, 1998, Meyers wrote to Gates asking if the union could offer any further suggestions concerning Frazier's situation. Gates responded with a letter that same day. Gates noted Frazier's long tenure with Firestone, and suggested that Frazier be allowed to work any other day of the week besides Sunday. After he received this letter, Meyers called Gates. He told Gates that Firestone would be willing to consider the proposal if the union would be willing to require another employee to work Frazier's Sunday shift. Gates refused, however, explaining that the union "wouldn't let them force another man to work his day off" because doing so would violate the CBA.

Frazier missed work again on July 26, 1998. Consequently, Firestone removed him from the schedule for absenteeism on August 3, 1998. On August 6, 1998, Firestone gave Frazier one more chance to avoid termination by agreeing to the swap option. Frazier refused, and missed work again on August 9, 1998. As a result of that absence, he was discharged.

The union had filed a grievance on Frazier's behalf, and an arbitrator issued a ruling on October 13, 1998. The arbitrator ruled that Firestone had offered Frazier a reasonable accommodation and that it had just cause to terminate him. However, the arbitrator also ruled that given the length of Frazier's service, Firestone should renew its prior offer to attempt to facilitate a shift swap and reinstate Frazier, without back pay or benefits. Frazier accepted the offer, and returned to work on October 26, 1998. At that time, Firestone wiped his attendance record clean.

After Frazier returned to work, Firestone posted notices in an effort to find employees to work his Sunday shift. One of the swap sign-up sheets that Firestone posted for Frazier was defaced, but at least one employee traded shifts with Fra-

zier. Nevertheless, Frazier had trouble finding someone to swap with him, in part because employees did not like to give up their Sundays. Ultimately, Frazier worked at least five Sundays at the plant, but did so under protest. On January 29, 1999, however, Firestone realigned the lubricator crews. As a result, Frazier was placed on a schedule that no longer requires him to work Sundays.

## ANALYSIS

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a summary judgment motion, the court must decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In reaching this decision, the court must consider the evidence in the light most favorable to the party opposing summary judgment. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

The burden of establishing that no genuine issue of material fact exists rests with the movant. *Jakubiec v. Cities Serv. Co.,* 844 F.2d 470, 473 (7th Cir.1988). However, neither the mere existence of some factual dispute between the parties nor the existence of some metaphysical doubt as to the facts is sufficient to defeat a motion for summary judgment. *McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1164 (7th Cir.1997). When confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue must affirmatively demonstrate, by specific factual allegations, a genuine issue of material fact requires a trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

With those principles in mind, the court now turns to the merits of the parties' respective summary judgment motions. In its complaint, the EEOC alleges that Firestone violated Title VII's prohibition on religious discrimination when it failed to accommodate reasonably Frazier and Waddell's religious objection to working on Sundays. Title VII prohibits employers from discharging or otherwise discriminating against an employee based on religion. 42 U.S.C. § 2000e–2(a)(1). The statute defines "religion" to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j). Moreover, it imposes an affirmative duty on employers to accommodate reasonably the religious observances and practices of its employees, unless the employer can demonstrate that such an accommodation would cause undue hardship to its business. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 63 n. 1, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 74, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

To establish a prima facie case of religious discrimination, the employee must show the following: (1) he has a bona fide religious practice that conflicts with an employment requirement; (2) he brought this practice to the employer's attention; and (3) the religious practice was the basis for some adverse personnel action. *Wright v. Runyon,* 2 F.3d 214, 216 n. 4 (7th Cir.1993), *cert. denied,* 510 U.S. 1121, 114 S.Ct. 1077, 127 L.Ed.2d 394 (1994) (*citing Beasley v. Health Care Serv. Corp.,* 940 F.2d 1085, 1087 (7th Cir.1991)). Once the employee has established a prima facie case of discrimination, the burden shifts to the employer to show either that it reasonably accommodated the religious practice, or that any accommodation would have resulted in undue hardship. *Baz v. Walters,* 782 F.2d 701, 706 (7th Cir.1986); *Redmond v. GAF Corp.,* 574 F.2d 897, 901 (7th Cir.1978).

■ Once the employer shows that it offered an option that reasonably accommodated the employee's religious needs, however, "the statutory inquiry is at an end." At that point, the employer need not also show that other accommodations preferred by the employee would have imposed undue hardship. *Ansonia*, 479 U.S. at 68, 107 S.Ct. 367; *see also Wright*, 2 F.3d at 217. A reasonable accommodation is one that eliminates the conflict between employment demands and the employee's religious needs. *Wright*, 2 F.3d at 217 (*citing Ansonia*, 479 U.S. at 70, 107 S.Ct. 367).

■ Although the employer carries the ultimate burden to accommodate, the employee must make some effort to cooperate with an employer's attempt to resolve the religious conflict. *Redmond*, 574 F.2d at 902–03; *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 145–46 (5th Cir.1982). Nonetheless, the employer "cannot excuse [its] failure to accommodate by pointing to deficiencies in [the employee's] suggested accommodation." *Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 401 (9th Cir.1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). However, the employer need not provide the specific accommodation that the employee desires; any reasonable accommodation is sufficient. *Ansonia*, 479 U.S. at 68, 107 S.Ct. 367. Moreover, Title VII does not require the employer to accommodate the employee's religious practices in a way that spares the employee any cost whatsoever. *See Brener*, 671 F.2d at 145–46; *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir.1977), *cert. denied*, 434 U.S. 1039, 98 S.Ct. 778, 54 L.Ed.2d 788 (1978).

■ If the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to do so without incurring undue hardship. *Smith*, 827 F.2d at 1085. Anything more than a de minimis cost on the employer constitutes undue hardship. *Hardison*, 432 U.S. at 84, 97 S.Ct. 2264. An employer who shows that it cannot accommodate an employee's religious needs without suffering undue hardship is not liable under Title VII. *Hardison*, 432 U.S. at 84, 97 S.Ct. 2264. Determining what constitutes a reasonable accommodation or undue hardship depends on "the facts and circumstances of each case, and ultimately boils down to whether the employer acted reasonably." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1577 n. 8 (7th Cir.1997) (*citing Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir.1995), *cert. denied*, 515 U.S. 1152, 115 S.Ct. 2600, 132 L.Ed.2d 846 (1995)).

In this case, Firestone does not challenge the sincerity of Waddell's or Frazier's religious objection to working on Sunday. Nor does it challenge that the EEOC has satisfied its prima facie case. Rather, it asserts that it proposed reasonable accommodations to their objections to working on Sundays, and that any other alternatives would have constituted an undue hardship.

The conflicts at issue in this case arose in two separate contexts. Because these conflicts involved different facts and only one involved Waddell, the court will address each one separately.

A. *Firestone's Transfer of Waddell and Frazier to the Warehouse Position*

As discussed more thoroughly above, when Waddell and Frazier returned to work following the strike, they learned that they would have to work every other Sunday. They promptly informed Firestone that they had religious objections to working Sundays, and requested an accommodation.

In Waddell's case, he wrote a letter to Firestone explaining his objection, and suggesting that Firestone allow him to work on one of his days off or transfer to another department. He met with Fire-

stone supervisors and Human Resources personnel several times to discuss a possible accommodation. However, there were no tire building jobs in the plant that would not require him to work Sundays. Firestone proposed that he take an unpaid leave of absence, or find another employee to work in his place on Sundays. The parties could not agree on an accommodation, however, and Waddell missed several Sunday shifts in violation of Firestone's attendance policy. After receiving a final written warning from Firestone, Waddell met with union and Human Resources representatives, and requested a leave of absence. Firestone granted Waddell's request, which allowed him to avoid termination and continue to accrue seniority.

After granting several requests by Waddell to extend that leave, Firestone offered Waddell a position in its warehouse. The position paid less than his previous one, but it did not require him to work any Sunday shifts. Waddell accepted this position because he believed he had no other alternative. He has since retired from Firestone, and until his retirement never had to work a Sunday at the warehouse.

In Frazier's case, he too informed Firestone that he could not work Sundays as soon as he learned of Firestone's conversion to a continuous work schedule following the strike. As with Waddell, Firestone informed Frazier that he could not work as a tire builder without working Sundays, and immediately offered him a lesser-paying position in the warehouse that did not require him to work Sundays. Frazier reluctantly accepted. At that time, the warehouse job was the only job in the plant for which Frazier was qualified that allowed him to work Mondays through Fridays.

Based on those events, Firestone argues that it provided Frazier and Waddell with reasonable accommodations. Specifically, Firestone asserts that it proposed reasonable accommodations when it offered to allow Waddell either to swap shifts with another employee, or to take a leave of absence, which would allow him to accrue seniority until a position opened that did not require him to work Sundays. Ultimately, such a position did become available, albeit at a lower rate of pay, and Waddell accepted Firestone's offer to work in the warehouse. Similarly, in Frazier's case, Firestone asserts that it satisfied its duty under Title VII when it offered Frazier a Monday through Friday position in the warehouse, even though that position paid considerably less. The EEOC responds that these accommodations were not reasonable because they required Waddell and Frazier to take a substantial cut in pay.[1]

In examining the issue of the reasonableness of Firestone's offered accommodations, the court must examine the precise nature of Frazier's and Waddell's religious beliefs. Both believed not only that they must abstain from work on Sundays, but also that they could not ask another to work in their place. Where an employee has more than one religious belief that conflicts with work requirements, the employer must accommodate both beliefs. *EEOC v. IBP, Inc.*, 824 F.Supp. 147, 152 (C.D.Ill.1993) (*citing EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 73 (5th Cir. 1990); *EEOC v. University of Detroit*, 904 F.2d 331, 335 (6th Cir.1990)). Under those circumstances, the employer does not satisfy its obligation to accommodate merely by proposing a shift trade that requires the employee to seek his own replacement, but must "make further attempts at accommodating the employee." *IBP*, 824

---

1. The EEOC also argues that the transfer to the warehouse was not a reasonable accommodation for Frazier because a later shift reassignment meant Firestone would again require him to work Sundays. However, the court will examine the adequacy of Fire-

stone's proposed accommodations as to that conflict separately. For now, the court will examine whether Firestone satisfied its statutory obligation under Title VII when the first conflict arose.

F.Supp. at 152 (*citing Smith*, 827 F.2d at 1088).

■ In this case, Firestone offered to allow Waddell to swap shifts with another employee to avoid working on Sundays. Waddell, however, believes he cannot personally ask another to work his shift.[2] It is not clear that Waddell ever informed Firestone of this belief. However, giving Waddell the benefit of the doubt, the court will assume that Firestone did know why Waddell could not agree to this option. In light of the precise nature of Waddell's beliefs, the court finds for purposes of summary judgment that Firestone's offer to allow him to swap shifts was not a reasonable accommodation.

Firestone also proposed that Waddell take an unpaid leave of absence, and later offered him a lesser-paying position in the warehouse. As for Frazier, it immediately offered the lesser-paying position, which Frazier accepted.[3] An offer of an unpaid leave of absence or a transfer to lesser-paying position may constitute a reasonable accommodation in certain circumstances. *See Eversley v. MBank Dallas*, 843 F.2d 172, 176 (5th Cir.1988) (finding that employer offered a reasonable accommodation of employee's objection to working Sundays by offering transfer to a lower-paying position and by trying to find other employees to switch shifts); *Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 519–20 (6th Cir.1975) (suggesting that a transfer affecting employee adversely may be a reasonable accommodation as last resort where no work available in employee's current job classification). Moreover, simply because the proposed accommodation would involve some cost to the employee does not make it unreasonable. *Ansonia*, 107 S.Ct. at 373.

However, some courts have suggested that an accommodation might not be reasonable if the employee must accept a significant reduction in pay or some other loss in benefits. *See Wright*, 2 F.3d at 217 (noting that reasonableness of an accommodation may be in question if employee "in order to accommodate his religious practices, had to accept a reduction in pay or some other loss of benefits"); *Rodriguez v. City of Chicago*, 156 F.3d 771, 776 (7th Cir.1998) (noting that a shift change or job transfer may be reasonable accommodation "particularly when such changes do not reduce pay or cause loss of benefits"); *see also Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir.1994) (finding that "employer who permits an employee to avoid mandatory Sabbath work only by using accrued vacation does not 'reasonably accommodate' the employee's religious beliefs").

■ Although Firestone's accommodations resolved the religious conflict, Frazier and Waddell had to accept a significant cut in pay. Accordingly, there is some question as to whether the accommodations were reasonable. The court need not resolve this issue, however, because the

---

**2.** In his deposition, Waddell testified as follows:

> Q. And as part of that suggestion, were you also suggesting to the Company that they switch somebody around to fill in to work for you.
> A. No, I was not.
> Q. Was it your proposal that the Company just work short-handed on Sunday and work with extra hands, particularly yourself, on either Thursday or Monday? Was that your suggestion?
> A. No more short-handed than they would be if I was not there at all.
> Q. I understand that. I am asking: Is this what you were suggesting?

> A. That's what I was suggesting.
> Q. When you were scheduled to work on Sundays, you were suggesting that they just work with one less man?
> A. One less man.

Defendant's Exhibit D, at p. 137.

**3.** Firestone did not offer Frazier the chance to swap shifts before offering him the lesser-paying position at the warehouse. Such an offer would most likely have been futile, however, as Frazier turned an identical offer down later when his conflict re-arose. Moreover, he then turned down Firestone's subsequent offer to take on the responsibility of finding someone to swap shifts with Frazier.

undisputed facts show that the only other proposed accommodation would have imposed on Firestone an undue hardship. *See Moore v. A.E. Staley,* 727 F.Supp. 1156, 1161 (N.D.Ill.1989) (finding that "undue hardship that would result from any of the proposed accommodations is an adequate and independent ground on which to grant the defendants' motion for summary judgment").

To avoid liability under Title VII, the employer need only show that an accommodation would impose a hardship on his business. The Supreme Court has construed this hardship as anything more than a de minimis cost to the employer. *Hardison,* 432 U.S. at 84, 97 S.Ct. 2264. Disturbing the job preferences of other employees to accommodate an employee's religious observance is considered such a hardship. *Hardison,* 432 U.S. at 81, 97 S.Ct. 2264. Moreover, the employer need not pay premium wages to accommodate an employee's Sabbath observance. *Hardison,* 432 U.S. at 84, 97 S.Ct. 2264.

The EEOC argues that Firestone could have allowed Waddell and Frazier to remain in their tire building positions by allowing them to take Sundays off and make up that time on one their regular days off. Firestone, however, asserts that this accommodation would have amounted to the creation of a special shift. Firestone could not create a special shift for certain employees without scheduling other workers to cover those Sundays that Waddell and Frazier would miss. That, Firestone asserts, would have violated the Terms & Conditions in effect at that time, and later the CBA, and would therefore have constituted an undue hardship.

In disputing Firestone's claim of undue hardship, the EEOC does not deny Firestone's assertion that creating a special shift for Waddell and Frazier would have technically violated both the Terms & Conditions and later the CBA. Nor does it dispute that Title VII does not require an employer to breach the terms of a valid collective bargaining agreement to accommodate an employee's religious conflict. *See Hardison,* 432 U.S. at 81, 97 S.Ct. 2264. Nevertheless, it asserts that Firestone's fear of facing a grievance by another union member if it provided the proposed accommodation is based on pure speculation, and cannot constitute undue hardship.

The EEOC, however, cites no case in which a court found that an employer's reluctance to breach a valid collective bargaining agreement was too speculative to constitute an undue hardship. Nor could it, as courts have consistently found that an employer need not endure the effects of a breach or face an actual grievance before claiming undue hardship. *See e.g., Weber v. Roadway Exp., Inc.,* 199 F.3d 270, 274–75 (5th Cir.2000) (finding that employer did not have to wait until it felt effects of altering other employees' work schedules to accommodate religious conflict to show that alteration would constitute undue hardship); *Beadle,* 42 F.3d at 637 (finding that the city could deny request of trainee to skip training rotation because of Sabbath out of concern that proposed accommodation would negatively affect the recruits' training); *Lee v. ABF Freight Sys., Inc.,* 22 F.3d 1019, 1023 (10th Cir.1994) (finding that employee's proposed accommodation of skipping his Saturday shifts to avoid working on Sabbath imposed an undue burden because it would necessarily alter other workers' schedules in violation of the seniority system that governed weekend shifts).

Nevertheless, the EEOC asserts, this case is different because the union's president, Roger Gates, explicitly approved of the proposed accommodation when the conflict arose later in Frazier's case. Accordingly, the EEOC argues, the union clearly would not have pursued an grievance if Firestone had allowed Frazier and Waddell their proposed accommodation in the first place.

A closer look at Gates' position on the proposed accommodation leads this court

to a different conclusion. It is true that in a letter to Firestone's Human Resources manager. Richard Meyers, Gates stated that "it does not seem to the Union that it would be an unreasonable accommodation to allow Mr. Frazier to move his normal scheduled Sunday, every other week, to a day that he would normally be off." He went on to state that Firestone routinely dealt with the inconvenience imposed by employee absences for any number of reasons, and noted that Firestone's needs fluctuated from shift to shift anyway. Moreover, he added that he did not believe that this would violate any other employee's shift preference. Gates conceded, however, that he understood Firestone's concern "because it would be a shift just designed for David Frazier," and added that, as the union's president, he had never seen a situation in which Firestone had created a special shift for one employee. What is more, upon receiving this letter, Meyers wrote back to Gates, asking if the union would allow Firestone to schedule another employee to work the Sunday shift in Frazier's place. Gates, however, refused, stating that the union "wouldn't let them force another man to work his day off" because that would violate the CBA.

Thus, the union supported the proposed accommodation only to the extent that it did not require any other worker to cover the shift. Essentially, the union's support was limited to encouraging Firestone to incur the loss of operating with one less employee every other Sunday. In other words, Gates was merely asserting that because Firestone incurs so many costs for so many reasons, it should be willing to incur one more. Thus, despite the EEOC's assertion, there is no evidence that the union was willing to overlook any violation of the CBA that Firestone might commit in an effort to accommodate Frazier, but was merely encouraging Firestone to incur any costs involved in providing Frazier with the accommodation of his choice. Gates' encouragement notwithstanding, Firestone would still have endured an undue hardship to implement the proposed accommodation. Although an employer might choose to incur greater than de minimis costs to accommodate an employee's religious beliefs, Title VII clearly does not require it to do so. *See Hardison*, 432 U.S. at 84, 97 S.Ct. 2264.

Moreover, the EEOC's argument that Firestone could merely have done without Frazier and Waddell on Sundays is not persuasive. Any cost in efficiency or wage expenditures that is more than de minimis constitutes undue hardship. *See Mann v. Frank*, 7 F.3d 1365, 1370 (8th Cir.1993) (rejecting employee's proposed accommodation that her employer "just do without" her because doing so would have caused the employer to suffer a loss in efficiency). An employer endures an undue hardship when it suffers a loss of production because one of its workers is absent due to a religious conflict. *Lee*, 22 F.3d at 1023 (*citing Hardison*, 432 U.S. at 84–86, 97 S.Ct. 2264). Furthermore, even if Firestone could recover the loss of Frazier's and Waddell's productivity by assigning their duties among the other employees scheduled to work that shift, the court must consider the imposition on those other employees. Essentially, they would have to work harder to compensate for Firestone's accommodation of another employee's religious beliefs-beliefs that these employees did not share. In essence, that imposition amounts to precisely what Title VII not only does not require, but prohibits. *Hardison*, 432 U.S. at 84, 97 S.Ct. 2264 (rejecting employee's proposed four-day work week because such an accommodation would result in "unequal treatment of employees on the basis of their religion"); *see also Brener*, 671 F.2d at 146 (holding that employer need not compel other employees to accept less favorable working conditions to accommodate religious beliefs of another).

Accordingly, the court finds that even if there is a question as to whether the lower-paying warehouse position constituted a reasonable accommodation, there was no

other alternative that would have resolved the conflict without imposing an undue hardship on Firestone. As a result, the court finds that there is no genuine issue of material fact requiring a trial on this issue, and summary judgment is proper in favor of Firestone.

### B. *Frazier's Religious Conflict Following the Shift Realignment in the Warehouse*

As noted above, Firestone's transfer of Frazier to the warehouse did not resolve the scheduling conflict permanently. In August 1997, the plant underwent a shift realignment. As a result, Frazier lacked the seniority to remain on the Monday through Friday shift. When Firestone informed Frazier of the realignment, it intentionally put him on a crew that was not scheduled to work the following Sunday to give the parties some time to work out a solution.

Firestone proposed that Frazier work nights, which would have allowed him to attend Sunday religious services. Frazier rejected that offer, as he objected to working any part of Sunday. At that time, however, there were no other jobs available that Frazier was qualified to perform and that would have allowed him to avoid working Sundays. By that time, the CBA had gone into effect and superseded the Terms & Conditions. Firestone asserts that under the CBA, its only options were to allow Frazier either to trade shifts with another employee, or to take an unpaid leave of absence until a position that did not require him to work on Sundays became available.

Frazier rejected these options, and suggested that Firestone allow him to work the Monday following his scheduled Sunday shifts. Firestone refused, and reiterated its previous offers. Frazier again declined Firestone's proposals, and started missing his Sunday shifts. As a result, Firestone punished him under its progressive attendance policy.

In September 1997, Frazier accepted a position as a lubricator. For the first several weeks of training, he was not required to work Sundays. Eventually, however, Firestone scheduled him to work Sunday shifts, and Frazier once again began to accumulate absences. As a result, Frazier was soon subject to termination under the progressive attendance policy. At this point, Firestone granted Frazier's request for a thirty-day leave of absence. During his leave, Frazier continued to accrue seniority. In addition, he worked for another employer, a practice that Firestone normally does not allow but overlooked in Frazier's case.

Frazier asked to extend the leave of absence several times. Firestone granted those requests through April 1998. At that time, Frazier met with Meyers and several union representatives. Firestone agreed to wipe Frazier's attendance record clean if he returned to work. Frazier agreed to come back and suggested several possible accommodations to resolve his still pending religious conflict. In particular, he suggested that Firestone transfer him to a painter or millwright position, assign him to the Monday through Friday shift, allow him to work the Monday following his scheduled Sunday shifts, or allow him to retire early with full benefits.

Firestone refused each of these requested accommodations, stating that they would all violate the CBA, and also that Frazier lacked the qualifications to become a millwright or painter. At this point, Firestone not only repeated its offer to allow Frazier to swap shifts, but also offered to undertake the burden of finding another employee to swap so that Frazier would not have to do so himself. Frazier refused this option.[4] As a result, he began

---

4. On this point, he testified in his deposition as follows:

Q. Now, in this letter Mr. Meyers again talked about the possibility of swapping shifts, correct?

missing his Sundays shifts and was again disciplined under the attendance policy. Finally, after Frazier missed his shift on August 9, 1998, Firestone terminated him.

The union had filed a grievance on Frazier's behalf, and an arbitrator issued a ruling on October 13, 1998. The arbitrator ruled that Firestone had offered Frazier a reasonable accommodation and that it had just cause to terminate his employment. However, the arbitrator also ruled that given the length of Frazier's service, Firestone should reinstate him and renew its prior offer to facilitate a shift swap, but without back pay and benefits. As a result of this ruling, Frazier accepted Firestone's offer and returned to work on October 26, 1998. At that time, Firestone wiped Frazier's attendance record clean, and began to seek volunteers to work Frazier's Sundays shifts.

Firestone had some trouble finding volunteers to swap shifts with Frazier, and he ultimately worked several Sunday shifts. However, the conflict was resolved on January 29, 1999, when Firestone realigned its lubricator crews. As a result, Frazier was given a Monday through Friday shift and has not had to work any Sundays since.

Firestone argues that it offered Frazier a reasonable accommodation when it offered to undertake the burden of finding an employee to swap shifts, and alternatively, that any of the other accommodations Frazier proposed would have been unreasonable. The EEOC disputes Firestone's characterization of its offer as reasonable, and argues that it should have allowed Frazier to abstain from working Sundays and make up the time on one of his days off.

■ Generally, an employer's offer to allow an employee to trade shifts with a qualified replacement is considered a reasonable accommodation if the employee refuses to work on a particular day for religious reasons. *Brener*, 671 F.2d at 145; *United States v. City of Albuquerque*, 545 F.2d 110, 113–14 (10th Cir.1976), *cert. denied*, 433 U.S. 909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977); *Moore*, 727 F.Supp. at 1160; *Meadows v. Golden Grain Macaroni Co.*, 1987 WL 46233, *11 (N.D.Ill. 1987). As noted above, however, Frazier believed not only that he must abstain from work on Sundays, but also that he could not ask another to work in his place. Where an employee has more than one religious belief that conflicts with work requirements, the employer must accommodate both beliefs. *IBP, Inc.*, 824 F.Supp. at 152 (*citing Universal Mfg. Corp.*, 914 F.2d at 73; *University of Detroit*, 904 F.2d at 335). Under those circumstances, the employer must "make further attempts at accommodating the employee." *IBP*, 824 F.Supp. at 152 (*citing Smith*, 827 F.2d at 1088).

A. Yes, ma'am.
Q. And he told you that not only would they permit a voluntary swap but they would on your behalf undertake to find people to swap with you, correct?
A. Yes, ma'am.
Q. But they would post a request for substitution for you; isn't that right?
A. Correct.
Q. And that's so that you would not have to be the person to ask somebody to work on a Sunday; isn't that right?
A. Yes.
Q. And that you had said that you would not—you were not willing to ask somebody else to work for you on a Sunday?
A. Or give my permission.
Q. For somebody to work for you?
A. Right.
Q. So here, though, the company is saying you don't have to take any action, we will take it on your behalf; isn't that right?
A. Correct.
Q. Now did you agree with the company's offer to try to find someone to work for you?
A. I don't believe so at that time.
Q. So at that time you did not except [sic] the offer that they made to try to find somebody to take your place on Sunday.
A. That is my understanding.
Q. That's correct?
A. That is my understanding.
Q. But that's what you did, you simply did not accept that offer?
A. Correct.
Defendant's Exhibit I, pp. 151–53.

In this instance, Firestone did just that: it offered to arrange the swaps so that Frazier would not have to ask personally anyone to work in his place. Although the employer carries the ultimate burden to accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation so that an accommodation is not impossible to reach. *Redmond*, 574 F.2d at 901–02; *see generally Ansonia*, 479 U.S. at 69, 107 S.Ct. 367 (implying that employee must cooperate by accepting accommodation offered by employer if reasonable). The employee has a duty, inherent in the employment relationship, "to attempt to accommodate his beliefs himself and to cooperate with attempts at reasonable accommodation by his employer." *Chrysler Corp.*, 561 F.2d at 1285. In offering to undertake finding employees to swap with Frazier, Firestone tried to provide Frazier with a reasonable accommodation both of his religious beliefs. *See Smith*, 827 F.2d at 1088 (finding that employer should have offered to orchestrate a shift swap for employee who objected to finding his own replacement on religious grounds). It should not be held liable for Frazier's failure to cooperate with that effort

The EEOC points out, however, that when Frazier eventually accepted Firestone's offer to arrange swaps, the arrangement did not always succeed. But Firestone was not required to provide absolute accommodation, only a "reasonable accommodation." *Ansonia*, 479 U.S. at 69, 107 S.Ct. 367. Moreover, a system of voluntary swaps always depends on willing volunteers, yet courts have consistently found these systems to be reasonable accommodations, even when a swap was not always possible. *Moore*, 727 F.Supp. at 1161 (*citing Brener*, 671 F.2d at 145–46). Title VII did not entitle Frazier to brush aside Firestone's reasonable attempts to accommodate his religious belief and stubbornly insist that it adopt his solution simply because Firestone's offered accommodation was imperfect.

Thus, the undisputed facts show that Firestone offered Frazier a reasonable accommodation. Once the employer makes that showing, the statutory inquiry is at an end. *Ansonia*, 479 U.S. at 68, 107 S.Ct. 367. The court is therefore not required to address the issue of undue hardship. Nevertheless, the court notes that the accommodation the EEOC asserts was preferable would have imposed on Firestone an undue hardship, and therefore constitutes an independent ground on which to grant Firestone's summary judgment motion. *See Moore* 727 F.Supp. at 1161.

In particular, the EEOC agrees with Firestone's assertion that it could not give him a painter or millwright position, assign him to the Monday through Friday shift, or allow him to retire early without violating the CBA. However, it asserts that Firestone could have allowed Frazier to make up his missed Sunday shifts on one of his days off. In response, Firestone argues that doing so would have amounted to creating a special shift for Frazier in violation of the CBA. Moreover, it asserts, it needed Frazier there during his scheduled Sunday shifts. Otherwise, Firestone must pay overtime to another lubricator. To make matters worse, Firestone asserts, a substitute lubricator would not know Frazier's route as well as Frazier would, and would therefore probably perform less efficiently. Thus, although this arrangement would have resolved Frazier's religious conflict, it would have resulted in diminished productivity and higher wages for Firestone.

In response, the EEOC points out that Firestone was usually able to find someone to cover Frazier's shift, and notes that Firestone was encouraging its lubricators to work overtime during this period anyway. Moreover, the EEOC adds, Frazier consulted with the second lubricator scheduled to work his Sunday shifts in advance of his absence to inform him of any problems or areas needing special attention.

As a result, the EEOC asserts, the second lubricator was able to cover much of Frazier's work when Firestone failed to schedule a replacement.

▪ Essentially, the EEOC is arguing that Firestone should have been willing to pay overtime wages because it was already paying them anyway. However, employers are simply not required to pay premium wages to accommodate an employee's religious conflict. *Hardison,* 432 U.S. at 84, 97 S.Ct. 2264. Moreover, the court does not see how Firestone's heavy workload during this period of time diminishes the hardship of losing a scheduled employee every other Sunday. To the contrary, that Firestone was asking lubricators to work additional hours demonstrates that it especially needed their labor during that time.

Nor is the court persuaded by the EEOC's assertion that the second lubricator assigned to Frazier's Sunday shift adequately made up for whatever loss in productivity Frazier's absence imposed. In making this argument, the EEOC necessarily concedes that this second lubricator had to work harder on every shift that Frazier missed. Thus, to accommodate Frazier, the EEOC would require Firestone to impose a greater workload on the other lubricator simply because he does not share Frazier's religious objection to working on Sundays. That greater workload therefore amounts to religious discrimination against another employee, something the Supreme Court in *Hardison* found to constitute an undue hardship. *See Brener,* 671 F.2d at 146–47 (finding that disruption of work routines and lowering of morale among employees forced to cover for employee with religious conflict was an undue hardship).

Finally, the EEOC argues that Firestone could have granted Frazier's request to work one of his days off to make up for missed Sunday shifts without fear that the union would object under the CBA. Specifically, it asserts that because the union's president, Roger Gates, encouraged Firestone to implement the accommodation Frazier requested, Firestone could breach the terms of the CBA without fear of a grievance. The court discussed this argument at length above in context of the conflict as it first arose for Frazier and Waddell, and finds it equally unavailing in this context. Thus, for the same reasons set forth more thoroughly above, the court does not agree with the EEOC's assertion that Gates' ostensible support for the proposed accommodation absolved Firestone of any potential liability for breaching the terms of the CBA. As a result, the court does not accept the EEOC's argument that Firestone's reluctance to breach the CBA was unreasonable.

Accordingly, the court finds that Firestone offered Frazier a reasonable accommodation when it offered to undertake finding other employees to work his Sunday shifts. Moreover, even if Firestone had not offered Frazier a reasonable accommodation, the EEOC's proposed accommodation would have imposed on Firestone an undue hardship. Firestone is therefore entitled to summary judgment in its favor on this issue as well.

## CONCLUSION

As the Seventh Circuit has instructed, the question of whether an employer either offered a reasonable accommodation or faced undue hardship "ultimately boils down to whether the employer acted reasonably." *Ilona of Hungary, Inc.,* 108 F.3d at 1577 n. 8 (*citing Beadle,* 42 F.3d at 636). In this case, the undisputed facts show that Firestone acted reasonably. The court emphasizes that it is not as if Firestone made no effort to accommodate Waddell and Frazier. It allowed both employees to take leaves of absence to avoid discipline under the attendance policy. During their respective leaves of absence, both men worked at outside jobs-a practice Firestone does not normally allow but overlooked here. Firestone gave both men other positions, albeit at a lower rate

of pay, which permanently eliminated the religious conflict for Waddell and resolved it for some time for Frazier. When a shift realignment revived the conflict for Frazier, Firestone arranged to allow him the first Sunday off so that the parties could work out a solution. After he returned from his later leave of absence, Firestone wiped his attendance record clean, and offered to find other employees to swap shifts with him.

It is true that Title VII religious discrimination cases tend to be fact intensive and are therefore often inappropriate for summary judgment. However, summary judgment is appropriate where there are no genuine issues of material fact. That both parties moved for summary judgment in this case demonstrates that they generally agree on the important facts. In particular, they largely agree on what Firestone did and did not do for Frazier and Waddell. They disagree, however, on whether what Firestone did was an adequate accommodation under the law, and whether implementing the EEOC's proposed accommodations would have imposed an undue burden.

Thus, given the undisputed facts, this court concludes that even if there is a genuine issue of fact as to whether the unpaid leave of absence and transfer to the warehouse constituted a reasonable accommodation of Frazier's and Waddell's conflicts, any other possibility would have imposed on Firestone an undue hardship. As for Frazier's later conflict, the court finds that the undisputed facts show that Firestone reasonably accommodated his religious beliefs when it offered to undertake finding replacements for him, and that any of the other proposed alternatives would have been unreasonable and an undue hardship on Firestone.

IT IS THEREFORE ORDERED THAT:

(1) The EEOC's Motion for Partial Summary Judgment (# 18) is DENIED;

(2) Firestone's Motion for Summary Judgment (# 14) is GRANTED;

(3) Both the Final Pre-trial Conference scheduled for May 24, 2000, and the jury trial scheduled to begin on May 30, 2000 are VACATED. The parties shall bear their own court costs.