**Albert A. BUONANNO, Plaintiff,**

v.

**AT&T BROADBAND, LLC, a Delaware corporation, Defendant.**

**No. 02–MK–778 (CBS).**

United States District Court,
D. Colorado.

April 2, 2004.

James Parker Rouse, Sr., Rouse & Associates, PC, Greenwood Village, CO, for Plaintiff.

Martha Ellen Cox, Paul Justin McCue, Sherman & Howard, Denver, CO, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRIEGER, District Judge.

**THIS MATTER** is before the Court following a multi-day bench trial. Having considered the evidence presented and the arguments of counsel, the Court makes the following findings of fact and conclusions of law. By separate document, the Court enters judgment in favor of the Plaintiff, Albert A. Buonanno (Buonanno or the Plaintiff) and against the Defendant, AT&T Broadband, LLC (AT&T or the Defendant).

### I. Jurisdiction

In this action, the Plaintiff brings a single claim—religious discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* He asserts two theories: (i) direct reli-

gious discrimination; and (ii) failure to accommodate his religious beliefs or practices. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331

## II. Facts

**The parties**

1 AT&T was, at all relevant times, an employer subject to Title VII.

2. Albert Buonanno was employed by AT&T from January 10, 1999 to February 1, 2001 Initially he worked as a cable dispatcher, scheduling jobs and dispatching field technicians. He later became a quota specialist, assigning quota points for specialists for the scheduling of jobs. In both capacities, he performed his work as required and without any disciplinary incident. His direct supervisor on February 1, 2001 was Jonathan Dunn.

3. Buonanno is a Christian who believes that the Bible is divinely inspired. He attempts to live his life in accordance with its literal language. Because the Bible requires that he treat others as he would like to be treated, Buonanno values and respects all other AT&T employees as individuals. He never has nor would he discriminate against another employee due to differences in belief, behavior, background or other attribute. However, his religious beliefs prohibit him from approving, endorsing, or esteeming behavior or values that are repudiated by Scripture.

**The policies**

4. In January 2001, AT&T promoted a new "Employee Handbook"(Ex. 2) that addressed "How We Work: Employee Guidelines" and "Doing What's Right: Business Integrity & Ethics Policies."

5. AT&T maintains a "Certification Policy," which provides that "[e]ach AT&T Broadband employee must sign and return the Acknowledgment of Receipt and Certificate of Understanding form indicating that you have received a copy of the handbook and the AT&T Code of Conduct and that you will abide by our employment policies and practices."

6. The parties agree that one the "employment policies and practices" to which Buonanno was required to adhere is AT&T's "Diversity Policy." The Handbook, however, does not contain a single policy clearly denoted as such; instead, it contains numerous references in various locations to AT&T's philosophy and goals with regard to diversity in the workplace. The parties' references to a "Diversity Policy" appear to be primarily referring to a section of the Handbook entitled "A Summary of Our Business Philosophy," a subsection of which is entitled "Diversity." It reads as follows:

> The company places tremendous value on the fresh, innovative ideas and variety of perspectives that come from a diverse workplace. Diversity is necessary for a competitive business advantage- and the company is competing for customers in an increasingly diverse marketplace. To make diversity work to our advantage, it's our goal to build an environment that:
>
> - respects and values individual differences
> - reflects the communities we serve
> - promotes employee involvement in decision making
> - encourages innovation and differing perspectives in problem solving
> - allows our diverse employee population to contribute richly to our growth.
>
> We want to create a team that is diverse, committed and the most talented in America. To that end, AT&T Broadband has a "zero tolerance" policy toward any type of discrimination, harassment or retaliation in our company. Each person at AT&T Broadband is charged with the responsibility to fully recognize, respect and value the differ-

ences among all of us. This is demonstrated in the way we communicate and interact with our customers, suppliers and each other every day.

7. Parsing the quoted language, the Court notes that the bulk of the section is, as described in the main heading, a collection of statements of corporate philosophy, rather than specific policy directives governing behavior. Only the second sentence of the last paragraph identifies an actual policy towards discrimination, harassment, or retaliation

8. There was no uniform understanding at AT&T as to what comprised the company's "Diversity Policy," or, more importantly, what an employee was required to do or not do to comply with it. In setting forth its factual findings, the Court will use the phrase "Diversity Policy" where the parties specifically spoke of it, with the recognition that scope and contents of such a "Policy" are somewhat dependent upon the person speaking. When speaking of the language quoted above, the Court will refer to it as the "Diversity Philosophy."

**Buonanno's objection**

9. Buonanno questioned the meaning of the third sentence in the second paragraph of the Diversity Philosophy, which reads " Each person at AT&T Broadband is charged with the responsibility to fully recognize, respect and value the differences among all of us." (The Court will hereinafter refer to this phrase as "the challenged language.") He believed that some behavior and beliefs were deemed sinful by Scripture, and thus, that he could not "value" that is hold in esteem or ascribe worth to such behavior or beliefs without compromising his own religious beliefs. Buonanno was fully prepared to comply with the principles underlying the Diversity Philosophy; he recognized that individuals have differing beliefs and behaviors and he would not discriminate

against or harass any person based on that person's differing beliefs or behaviors. However, he could not comply with the challenged language insofar as it apparently required him to "value" the particular belief or behavior that was repudiated by Scripture. Accordingly, if he challenged language literally required him to do so, he could not sign the Certificate of Understanding, agreeing to "abide by" such language.

10. Buonanno consulted with his pastor, Scott McCall, of the Crow Hill Bible Church for guidance. Buonanno also discussed his concerns with his supervisor, Dunn, a practicing Christian. Dunn did not believe that the challenged language was inconsistent with his personal, religious beliefs as a Christian, but he urged Buonanno to clarify the issue in a written communication to his AT&T Human Resources Manager, Susan Batliner. In accordance with this suggestion, on January 30, 2001, Buonanno slipped a written communication under Batliner's office door.

11 In the letter (Ex.4), Buonanno explained that

I can't comply with the ambiguous statement under 'Diversity' on pages six and seven [of the Handbook]... As an AT&T employee I am fully cognizant of the fact that there is diversity among its members. Since being hired on January 10, 1999, I have indiscriminately conducted myself in a professional manner with all people.... However, ... I believe it's wrong for any individual or organization to attempt to persuade me to fully respect and fully value any differences which are contrary to God's word. In order for me to comply with this diversity statement in the company handbook, I would have to deny my faith; this I will not do. It is this reason that prohibits me from signing the certificate of acknowledgment... As an AT&T employee I give you my word

that I will continued to conduct myself in the same professional manner. But I can't allow any group or individual to choose for me what I must respect or place value on.

The letter was accompanied by an unsigned copy of the Certificate.

**Events leading to Buonanno's termination**

12. Batliner discovered the letter the next morning. She discussed it with to her superior, Debora Davis, the Vice President of Human Resources for AT&T's Colorado operation. Davis instructed Batliner to talk to Buonanno's supervisor and then with Buonanno to clarify his concerns. Batliner was instructed to ask questions, get information and to explain the importance of the Diversity Policy. Davis told Batliner that signing the Certificate was required of all employees, but she did not authorize Batliner to terminate Buonanno's employment if he did not sign.

13. Batliner met with Dunn and his supervisor, Scott Neesley, to discuss the letter from Buonanno. They agreed that importance of the Diversity Policy should be explained to Buonanno and that he should be told that signing the Certificate was required to retain his employment. There was no discussion of the particular meaning of the challenged language or what obligations, if any, it imposed on employees.

14. Batliner then scheduled a morning meeting with Dunn and Buonanno. On the way to the meeting, Dunn informed Buonanno that signing the Certificate was a requirement for continued employment. He suggested that Buonanno seek clarification of the challenged language, suggesting that Buonanno inquire if the language would require him to value, for example, a "neo-Nazi skinhead's" beliefs.

15. The meeting among Batliner, Buonanno and Dunn lasted between 30 and 40 minutes. Batliner explained the importance of the Diversity Policy and stated that Buonanno was required to sign the Certificate in order to keep his job. However, there does not appear to have been any discussion about the meaning of the challenged language or what it required. Indeed, when Buonanno attempted to clarify its meaning by asking how it would apply to the beliefs of "neo-Nazi skinheads," Batliner refused to engage in what she characterized as a "philosophical debate."

16. Buonanno iterated that he supported the Diversity Philosophy and would not discriminated against, harass, or retaliate against any employees. However, he could not disavow his religious beliefs by endorsing behavior or beliefs he considered sinful. Without clarification as to the identified language, he explained, he could not sign the Certificate.[1] Batliner refused to clarify. Buonanno and Dunn both asked whether there was some way to work around the challenged language or the signing of the Certificate. Batliner refused and repeated that Buonanno must sign the Certificate as presented to keep his employment.

17. Buonanno declined to sign the Certificate for the reasons he had stated in the communication. Batliner terminated his employment and proceeded to conduct an

---

1. Much of the trial testimony touched upon Buonanno's reluctance to "value" the particular behavior of homosexuality. However, the subject of homosexuality was apparently never addressed (other than between Buonanno and Dunn in a private conversation) at any time prior to Buonanno's termination. With the exception of mentioning "neo-Nazi skinheads" in the meeting with Batliner, all communication regarding Buonanno's religious beliefs referred to his general unwillingness to "value" conduct that was condemned by the Bible.

exit interview. Batliner later reported to Davis that she had not gathered any information about Mr. Buonanno's concerns, and had terminated his employment solely due to his refusal to sign the Certificate.

**AT&T's interpretation of the Diversity Policy**

18. As is clear from the language of the Diversity Philosophy, as well as the numerous references to "diversity" elsewhere in the Handbook, AT&T maintains an overarching policy of inclusiveness. AT&T defines "diversity" broadly—contemplating all attributes, history, experience, skill, perspective, etc. that make one individual different from another, and considers all of those various characteristics as having potential value to its business development. AT&T believes that its Diversity Philosophy helps it better acquire customers, understand customer needs, and increase its sales and provide better customer service. For example, Senior Vice President of Human Resources David Brunick testified that in the past, English-speaking employees recognizing the differences between themselves and Spanish- or Russian-speaking employees allowed the company to expand into Spanish- and Russian-speaking markets that were otherwise unavailable.

19. AT&T maintains that permitting an employee to certify anything other than full agreement with all of the language in the Handbook would destroy the competitive advantage its Diversity Philosophy creates. Doing so would demonstrate to other employees that AT&T's policies were not uniformly applied and enforced.

20. Although the challenged language, "Each person at AT&T Broadband is charged with the responsibility to fully recognize, respect and value the differences among all of us" is undoubtedly consistent with the spirit of the Diversity Philosophy, it is ambiguous. Taken literally, the language appears to require an employee to ascribe some value to those particular beliefs or behaviors of his or her co-workers that he or she does not share. Taken figuratively, however, the language could be understood to mean that an employee must ascribe value to the fact *that there are* differences among employees, but not necessarily require that each employee has to find some value in each of the various behaviors or beliefs of his or her co-workers. As discussed below, the testimony of some AT&T officials reflected uncertainty over whether the language was intended to have a literal or figurative interpretation.

21 Five corporate officials testified about the challenged language, but none of them shared a common understanding of what it actually requires. For example:

- Scott Neesley, Director of Workforce Management and Buonanno's second-line supervisor, testified via deposition. He understood the Diversity Policy to require employees to "celebrate the differences in all of us."

- Batliner believed the challenged language required employees to treat each other with respect, and to "respect and value differences in people [and] value the people." She did not directly answer repeated questions by the Plaintiff's counsel's question as to whether the language required employees to value the actual differences themselves;

- Davis understood the challenged language to require employees to do something more than simply treat each other professionally, but did not specifically state what additional conduct was necessary. Even more problematic, Davis implied that the challenged language was impossible to enforce because it addressed only an employee's thoughts, rather than an employee's behavior;

- Brunick, the highest executive within AT&T to review and approve the challenged language, had yet another interpre-

tation. He intended the challenged language to require that an employee not only respect and "value" other employees as individuals, *but also* to affirmatively "value" the disparate attributes, behavior, or beliefs themselves. He testified that valuing disparate attributes was essential to ensure that every employee would "feel valued and respected for who they are." This interpretation was subject to undisclosed exceptions, however. Brunick testified that, although the fact that one of "the differences among" employees could be that one employee had been convicted of murder, the challenged language would not require other employees to "value" that particular difference. Similarly, he testified that an Orthodox Jewish employee would have to "value" the difference between himself and a fellow Muslim employee, but that the challenged language would not require the Jewish employee to actually "adopt" the beliefs of the Muslim employee. When asked what he understood the word "value" to mean, he testified that it required employees to "understand their difference, respect their difference, and value what they bring to the table";

● Deborah Wilson, Director of Employee Relations, drafted the Handbook and the challenged language. She, like Brunick, offered somewhat ambiguous testimony as to her interpretation of the language. On one hand, she did not intend the language to compel employees to endorse or esteem the beliefs or behavior of others, but, on the other, believed that the language required employees to "respect and value the individual differences that may exist between different employees." She attempted to clarify that conflict by stating that, to "value" the differences in others, an employee would "treat them in a respectful manner[,] would not say things or exhibit, whether it's behaviors or anything, that would that would offend them potentially or that would exhibit anything that I would say that I don't value you or I don't re-spect you or that aspect of your difference." Wilson agreed that the challenged language essentially means "that employees are supposed to value and respect each other as individuals and as persons," but generally thought that an employee would also have to "value" the actual difference itself. Upon questioning by the Court, Wilson acknowledged that the challenged language "was intended to mean that each person had to fully recognize, respect, and value *that there are differences among all of us*," (emphasis added), and that the language "did not require employees to value the specific difference, but [only] the fact that there were differences." But upon re-cross by Buonanno's counsel, Wilson crystalized the ambiguity in the challenged language, testifying that she did not see a difference between "valu[ing] the fact that there are differences" and "valu[ing] the difference itself." Ultimately, she admitted that AT&T did not expect individuals to change their religious beliefs, and expressly acknowledged that it would have "accomplished [AT&T's] goals" had Buonanno agreed to "respect and value the fact that there are differences among us."

22. No AT&T representative explored or explained the intended meaning (or any of the various interpretations) of the challenged language to Buonanno. No AT&T employee inquired as to the particulars of Buonanno's concerns, sought to devise ways to accommodate Buonanno's religious beliefs, or reassured him that the challenged language did not require him to surrender his religious beliefs. At all relevant times, Buonanno was presented with a choice of between accepting the language of the Handbook without any additional clarification and signing the Certificate, or losing his employment.

**Damages**

24. Buonanno was upset and humiliated by his termination. He had difficulty

sleeping and withdrew socially, but obtained no medical or psychological treatment. He was unemployed for a period of 4 months before obtaining a job as a mental health counselor with Mental Health Corporation of Denver in late May 2001. He has continued in that job since his hiring. As a mental health counselor, Buonanno has had reduced earnings and fewer benefits compared to that which he would have received at AT&T. However, the counselor position has provided a flexible schedule enabling Buonanno to complete his undergraduate degree. He now wishes to change careers to counseling and intends to seek a master's degree from Denver Seminary.[2] Continuing to work in his present position, he anticipates that he will complete his master's degree by year end 2006.

25. Buonanno's expert calculated his economic losses as follows:

His projected salary at AT&T, based upon an assumed annual raise of 3.5%, over Buonanno's expected working life of approximately 20 years from the date of his termination in 2001, would have totaled $1,283,762 [3];

● He would have earned 401(k) matching contributions by AT&T, assumed to be 75% of his typical contributions of 10% of his gross income, over his expected working life, totaling $96,282;

● Buonanno's actual and projected future salary as a mental health counselor, over the remainder of his expected working life, totals $1,168,368, a difference of approximately $115,394 compared his projected future salary had he remained employed at AT&T; and

● He is not expected to earn 401(k) matching contributions in his current position, yielding a loss of $96,282 from his projected 401(k) matching contributions had he remained employed at AT&T.

A key feature of Buonanno's expert's analysis was the conclusion that, beginning in 2007, Buonanno's receipt of a master's degree would enhance his earning capacity as a mental health counselor, such that his projected salary as a mental health counselor would thereafter always exceed his projected salary had he remained at AT&T.

26. AT&T's expert calculated Buonanno's economic loss as follows:

● As a general rule, changes of career paths may create salary disparities at the outset, but that within 3–5 years, various market forces will restore the employee to the same earnings path that existed prior to the career change;

● From his termination to the date of trial, Buonanno lost back pay totals $ 66,176;

● Projected future salary diminution is $ 26,288,[4] with Buonanno's projected actual

---

**2.** Buonanno testified that, if her were employed by AT&T, it would pay for schooling if "it was going towards your, you know—your degree or within the company." This can be interpreted consistently with the statement in the Handbook that the company will pay "for career-related undergraduate or graduate studies ... you can use to build your job skills." In other words, the Court understands the policy to provide for reimbursement of education relevant to the employee's actual work duties.

**3.** In addition to calculating these raw figures, Buonanno's expert also computed totals discounted to present value as of February 1, 2001 based on various assumptions. For the reasons stated herein, the Court will calculate damages based on the raw, undiscounted figures.

**4.** AT&T's expert did not specifically testify as to the assumptions underlying his calculations. It appears that he has used the same projected AT&T salary figures as Buonanno's expert namely, 3.5% annual raises but has a different and unexplained method for calcu-

salary matching or outpacing his projected AT&T salary by the end of 2007; and

• Based on his general assumption regarding market forces mentioned above, AT&T's expert did not specifically address the issue of 401(k) matching contributions, believing that such benefits would be recovered by Buonanno over the same 3–5 year period.

## III. Conclusions of law

The Plaintiff articulated two distinct theories of religious discrimination in his closing argument: (i) direct religious discrimination, as discussed in *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033 (10th Cir.1993); and (ii) failure to accommodate.

### A. Direct discrimination

■■ Under *Shapolia,* a claim of direct religious discrimination lies where an employee contends that he received unfavorable treatment "motivated by an animus directed against" his particular religious persuasion. 922 F.2d at 1037 (employee alleged discriminatory treatment motivated by animus against non-Mormons). In such circumstances, the Court applies a slightly modified version of the customary shifting-burden test. A plaintiff must come forward with evidence establishing: (i) that he was subjected to some adverse employment action; (ii) that, at the time the employment action was taken, the employee's job performance was satisfactory; and (iii) an inference that the employment actions were taken because of a discriminatory motive based upon the employee's failure to hold or follow his or her employer's religious beliefs. 922 F.2d at 1038. The employer must then present evidence to support a non-discriminatory reason for the adverse action. In rebuttal, the employee must prove pretext, all in accor-

dance with the classic *McDonnell Douglas* analysis. *Id.*

■ Here, Buonanno did not establish the third element of the *prima facie* case, that the actions taken against him were motivated by his failure to follow his employer's religious beliefs. With the exception of Dunn, nothing in the record establishes that any of his supervisors held particular religious beliefs, much less that their beliefs were in conflict with Buonanno's. Dunn, Buonanno's immediate supervisor, is a Christian. Thus, Buonanno has not proved that he was terminated based on his failure to follow the religious beliefs of his employer. Accordingly, AT&T prevails on this claim.

### B. Failure to accommodate

■■ To establish of a claim of religious discrimination based on a failure to accommodate theory, a plaintiff must prove: (i) he had a bona fide religious belief that conflicts with an employment requirement; (ii) he informed his or her employer of this belief, and (iii) he was fired for failure to comply with the conflicting employment requirement. *Thomas v. National Association of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir.2000). The burden then shifts to the employer to either conclusively rebut one or more elements of the plaintiff's *prima facie* case, to show that it offered a reasonable accommodation, or to show that it was unable reasonably to accommodate the employee's religious needs without undue hardship on the conduct of its business. *Id.* at 1156.

■■ The employer and employee have reciprocal duties in discussing the matter and attempting to reach a reasonable accommodation. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986). The employer

lating Buonanno's projected salary as a men-

tal health counselor.

has the burden of initiating the discussion of accommodations once it becomes clear that the employee's beliefs conflict with an employment policy. Where an employer has made no efforts to accommodate the religious beliefs of an employee before taking action against him, the employer may only prevail if it shows that no accommodation could have been made without undue hardship. *Toledo,* 892 F.2d at 1490.

■■■■ The reasonableness of a proposed accommodation is considered in light of all of the facts and circumstances of the case. *Weilert v. Health Midwest Development Group,* 95 F.Supp.2d 1190, 1196 (D.Kan.2000), *citing United States v. Albuquerque,* 545 F.2d 110, 114–15 (10th Cir. 1976). A proposed accommodation poses an "undue hardship" on the employer if it bears more than a *de minimis* cost or significant impact on efficiency, or disrupts a bona fide seniority system. *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 84, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977); *Lee v. ABF Freight System, Inc.,* 22 F.3d 1019, 1023 (10th Cir.1994); 29 C.F.R. § 1605.2(e)(2). However, the claimed hardship must be more than merely speculative. *Banks v. Service America Corp.,* 952 F.Supp. 703, 709 (D.Kan.1996), *citing Smith v. Pyro Mining Co.,* 827 F.2d 1081, 1085 (6th Cir.1987); *see also Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481, 1492 (10th Cir.1989). An employer's costs of accommodation "must mean present undue hardship, as distinguished from anticipated or multiplied hardship." *Cook v. Chrysler Corp.,* 981 F.2d 336, 339 (8th Cir.1992)

### 1. *Prima facie case*

■■■■ Turning first to the requirements of a *prima facie* case, Buonanno established that he has a bona fide religious belief that conflicted with an employment policy. AT&T does not contest that Buonanno's beliefs are religious in nature, nor that they are bona fide. AT&T understood that Buonanno was concerned that those beliefs conflicted with the challenged language in the Handbook and, by extension, the Certification Policy. As Buonanno stated in his written communication to Batliner, his religion teaches that certain (unidentified) behavior is sinful, yet the challenged language requires him to "value" differences among employees presumably, some of those "differences" might involve conduct proscribed by Buonanno's religion.

It is also evident that Buonanno communicated the existence of such a conflict to AT&T. Buonanno's written communication informed AT&T of his concern that his religious beliefs were in conflict with the Handbook, albeit in a very general way. Although Buonanno's communication with AT&T did not particularize the nature of his religious concerns, his letter to Batliner and his comments at the meeting were sufficient to establish notice to the employer of an issue of religious conflict and to invoke the process of seeking a reasonable accommodation.

There is no dispute that Buonanno satisfies the third element of the *prima facie* case: that he was terminated for failing to comply with the conflicting employment policy.

### 2. *AT&T's burden*

■■■■ AT&T must either show that it offered a reasonable accommodation, or to show that it was unable reasonably to accommodate Buonanno's religious needs without undue hardship on the conduct of its business. AT&T failed to offer any accommodation, thus the sole question is whether it could have accommodated Buonanno's belief without undue hardship. AT&T contends that it could not have carved out an exception to the "Diversity Policy" for Buonanno without diminishing the value of the "policy" as a whole.

As noted earlier, AT&T's Diversity Philosophy reflects a legitimate and laudable business goal. The Court accepts AT&T's contention that allowing employees to strike piecemeal portions of the Handbook or Certification could pose an undue hardship on its business, making uniform application of company policies much more difficult. Nevertheless, had AT&T gathered more information about Buonanno's concerns before terminating his employment, it may have discovered that the perceived conflict between his beliefs and AT&T's policy was not an actual conflict at all, or that if a true conflict existed, it was possible to relieve that conflict with a reasonable accommodation.

Had Batliner sought more details about Buonanno's concerns, rather than steadfastly insisting that he had to agree with the ambiguous "Diversity Policy" to retain his job, she would have discovered that, but for the challenged language, Buonanno agreed with the entirety of the Handbook, including the Diversity Philosophy, the non-discrimination policy, and all other aspects of AT&T's policies and practices. His only objection was to a literal interpretation of the challenged language that required him to "value" particular behavior and beliefs of co-workers Had Batliner followed Davis' instructions and engaged in a conversation through which she gathered information about Buonanno's concerns, based on her interpretation of the challenged language, she would have discovered no actual conflict between the challenged language and Buonanno's religion. If Batliner had, as directed, reported these findings back to Davis, based on Davis' interpretation of the challenged language, Buonanno's religious beliefs would not have been in conflict with the challenged language. Had Batliner reported this information to Brunick, he would have observed that, like the Jewish employee who must recognize but not adopt the differing beliefs of his Muslim co-worker, the challenged language did not require Buonanno to actually "value" the particular conduct of his co-workers that he considered sinful. Had Wilson been consulted, Buonanno's promise to recognize that there were differences between what he believed and did and what his co-workers believed and did and to treat everyone with respect regardless of their beliefs and behavior would have been sufficient to accomplish the goals of the challenged language. Had Batliner, Davis, Brunick, or Wilson ever explained that they understood the challenged language to have a figurative, rather than literal, meaning and listened to his concerns, the issue could have been resolved without any need for accommodation. Accordingly, AT&T has failed to show that it could not have accommodated Buonanno's beliefs without undue hardship.

Even assuming that despite the testimony of Batliner, Davis, and, at times, Brunick and Wilson AT&T intended that the challenged language be applied literally and that all employees were affirmatively required to ascribe value in the various beliefs and behaviors of their co-workers, AT&T could nevertheless have accommodated Buonanno without suffering undue hardship. Although AT&T's Diversity Philosophy confers a business advantage, AT&T did not show that the literal application of the challenged language was necessary to obtain such advantage. For example, Wilson explained the advantages conferred by the "Diversity Policy" by relating an anecdote in which homosexual employees at American Express, sensing a need for estate-planning services in the gay community, proposed the creation of a successful new targeted product. In such example, no employee at American Express was required to ascribe any "value" to the practice of homosexuality in order to capitalize on the opportunity. Rather, American Express officials simply recog-

nized that homosexual employees had a unique perspective on ways to market the company's product. Thus, as Wilson admitted, a minor revision of the challenged language, requiring all employees company-wide to "fully recognize, respect and value *that there are* differences among all of us" would have "accomplished [AT&T's] goals" as set forth in the Diversity Philosophy, without imposing any apparent hardship on AT&T.[5] Whether such a change is characterized as clarifying AT&T's interpretation of the existing Handbook language or a reasonable accommodation for Buonanno is irrelevant. AT&T violated Title VII by failing to engage in the required dialogue with Buonanno upon notice of his concerns and by failing to clarify the challenged language to reasonably accommodate Buonanno's religious beliefs.

### 3. *Damages*

 The parties' experts both assumed that Buonanno's wage growth at AT&T would be 3.5% annually. The Court therefore adopts this amount. To calculate Buonanno's lost backpay, the Court compares his current earnings with what he would have earned had he stayed at AT&T to the present date. Buonanno's expert supplied figures for Buonanno's projected pay at AT&T and his actual pay at Mental Health Corp. of Denver for each year from 2001 to the present.. According to these figures, from his termination on February 1, 2001 through the time of trial, Buonanno's lost backpay was $67,179. AT&T's expert's calculation of Buonanno's backpay over this period is roughly the same, differing only slightly in the projected salary

for 2001 and 2004, yielding a total of $66,176. The Court resolves this disparity by referring to Buonanno's tax return from 2000, which shows an annual salary of $42,765. Applying the 3.5% annual raise yields a 2001 salary of $44,261, which the Court reduces by 11/12 to reflect the period from February 1 to the end of that year. That figure, $40,572, is almost exactly the figure quoted by Buonanno's expert for his 2001 projected salary. Accordingly, in the absence of records to substantiate AT&T's expert's calculations of backpay, the Court finds that Buonanno was damaged in the amount of $67,179 in lost wages from the time of termination to the time of trial.

Next, Buonanno's expert calculated that he lost 401(k) matching contributions that AT&T would have made. According to Buonanno's expert, from his termination to the date of trial, this figure would have totaled $10,539. AT&T's expert did not include this item in his calculation of damages, but also did not testify that it would be inappropriate to award them.[6] Accordingly, the Court finds that Buonanno is entitled to $10,539 to reflect lost 401(k) matching contributions from termination to the date of trial.

 Both Buonanno's expert and AT&T's expert calculated pre-judgment interest on backpay figures. Under Title VII, a district court is authorized to grant prejudgment interest on a backpay award. *Daniel v. Loveridge,* 32 F.3d 1472, 1478 (10th Cir.1994), *citing Loeffler v. Frank,* 486 U.S. 549, 557–58, 108 S.Ct. 1965, 100 L.Ed.2d 549 (1988). Both parties used an

5. Arguably, circulating a memo noting the revision to all AT&T employees might involve some costs in photocopying and distribution, but the Court would consider such costs to be *de minimis.*

6. AT&T's expert's calculations include a column reflecting "pre-separation benefits" and

"post-separation benefits." The "pre-separation benefits" column corresponds roughly to Buonanno's expert's calculations of 401(k) matching contributions loss. There was no testimony or other evidence to explain the figures in the "post-separation benefits" column, and thus, the Court disregards it.

8% prejudgment interest rate, and thus, the Court will adopt that figure.[7] Accordingly, Buonanno is entitled to prejudgment interest on his economic losses of $77,718 at 8% interest for 3 years from February 2001 to February 2004, for a total of $18,652. Thus, Buonanno's total compensatory economic damages are $93,370.[8]

■■ Buonanno also requests the costs of his education, arguing that, had he remained employed at AT&T, the company would have paid for him to obtain a bachelor's and master's degree. The Court finds that Buonanno's testimony on this point was speculative. Although Buonanno testified that AT&T would have paid the cost of a bachelor's degree, there is no indication that Buonanno had anything more than abstract plans to obtain a degree at the time he was terminated. Buonanno was not taking classes towards a degree during his employment with AT&T, and did not begin such work until May 2001, several months after his termination. Accordingly, the Court cannot find that Buonanno would have obtained a bachelor's degree at AT&T's expense had he not been terminated. Buonanno offered nothing more than speculative testimony that AT&T would pay for a master's degree, based on his observation that one other employee was compensated for the cost of obtaining a master's degree. There was no other evidence in the record to suggest that AT&T would have paid for Buonanno to obtain a master's degree, particularly one from Denver Seminary. Accordingly, the Court declines to award damages for educational expenses.

■ Buonanno also requests compensatory damages reflecting emotional distress. The record reflects that he was upset at being terminated and that he suffered from some sleep loss, but did not seek any psychological counseling. He was unemployed for approximately 4 months before finding new work. The Court finds that, although distressing, the loss of a job under these circumstances is not grounds for a large damage award. Buonanno was not subjected to rude or insulting treatment, nor purposefully humiliated. Although he was understandably upset at losing his job because of his religious beliefs, that loss was related to an inflexible application of a corporate policy, not the result of direct, invidious discrimination or a false accusation of misconduct. Accordingly, the Court finds that a compensatory damage award of $4,000 is sufficient to compensate Buonanno for any emotional upset he may have suffered as a result of AT&T's actions.

■■■ Next, Buonanno requests front pay, reflecting the difference between his projected AT&T salary and his projected actual salary until he reaches age 65. Reinstatement is the preferred remedy for an employee who was unlawfully terminated, and should be directed unless it is not viable where, due to an employer's extreme hostility, a productive and amicable working relationship is impossible, or where the employer-employee relationship has been irreparably damaged by animosity caused by the lawsuit. *Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158,

7. As a general rule, absent a statute mandating compounding of interest, simple interest will be used. *Quinlan v. Koch Oil Co., a Div. of Koch Industries, Inc.*, 25 F.3d 936, 941 (10th Cir.1994). Title VII contains no requirement of compound interest.

8. Buonanno's expert reduced his economic losses to present value as of the date of February 1, 2001. She did not offer an economic explanation for doing so, stating only that she had been instructed to do this by attorneys in other cases. Although it is appropriate to reduce future losses to present value so that they may be paid today, there is no reason to continue to reduce them to a point further in the past where no payment was made.

1176 (10th Cir.2003). Where reinstatement is not practical, the Court may, in its discretion, award front pay to compensate the employee for damage to his earning capacity that may persist into the future. *Id.*

■ Nothing in the record demonstrates any particular animosity on the part of AT&T towards Buonanno. He was considered to be a high-performing worker during his employment, and was terminated based on a miscommunication concerning company policies, not for any misconduct. On the other hand, the Court is well-aware that litigation, especially litigation that culminates in a trial, is often a polarizing process, driving parties further apart rather than closer together. In the absence of a representation from Buonanno that he seeks reinstatement or from AT&T that reinstatement would be acceptable, the Court presumes that front pay is a more appropriate remedy. Indeed, AT&T's expert calculated front pay costs as part of his analysis of Buonanno's damages, suggesting that AT&T concedes that front pay is appropriate in lieu of reinstatement.

According to Buonanno's expert, his projected salary at AT&T for the remainder of 2004 would have been $42,352, and his projected actual salary is $23,300, reflecting a difference of $19,052. His projected AT&T salary for 2005 would have been $50,793, and his projected actual salary is $27,404, reflecting a difference of $23,389. His projected AT&T salary for 2006 would have been $52,570, and his projected actual salary for that year is $40,542, a difference of $12,208. At this point, Buonanno's expert expects that Buonanno will have his master's degree, and that his earning power as a mental health counselor will eclipse his salary potential had he remained at AT&T. As a consequence, Buonanno will not suffer any additional diminution in earning capacity. Accordingly, his total front pay would be $54,469, reflecting approximately 2¾ years of diminished earnings.

AT&T's expert calculates a total of $26,288 in front pay losses, but does not explain how these figures were calculated. In the absence of evidence to support these assumptions, the Court accepts Buonanno's expert's figures and finds that Buonanno's lost front pay is $54,469. Both experts agreed that such future damages should be reduced to present value. Buonanno's expert used a 12% discount figure, reflecting uncertainty over events that would occur over the relatively long (15 year) timeframe. AT&T's expert did not testify regarding the discount rate he used. The Court finds that a reduction of front pay to present value is appropriate, but finds that the damages occur over a substantially shorter timeframe (2¾ years) than that assumed by Buonanno's expert. This shorter timeframe involves considerably less uncertainty, and accordingly, warrants a smaller discount rate. The Court finds that a discount rate of 4% is appropriate, as it more closely reflects current interest rates and the likely return on investment Buonanno can expect to receive during the relatively short 2¾ year period.[9] To calculate the present value of $54,469 paid 2¾ years from now at a discount rate of 4%, the Court uses the formula: $54,469 = x/(1 + .04)^{2.75}$, which yields the sum of $48,899. The Court awards this sum as front pay.

Buonanno's expert also requests front pay reflecting lost 401(k) matching contributions to the end of Buonanno's working life, arguing that such matching contributions are not common in the mental health field and that even with equalized salary

---

**9.** This is also the rate used by Buonanno's expert to discount backpay earnings from the date of trial to their present value as of February 1, 2001. As such, the Court finds it to accurately reflect current economic conditions.

potential, Buonanno will continue to suffer from this loss for the remainder of his career. The Court finds this assumption speculative, as it relies on numerous assumptions: (i) that AT&T would have continued to provide the same level of matching contributions for the next 15 years (indeed, there is no evidence in the record to indicate that AT&T continues to make matching 401(k) contributions even at the present time); (ii) that Buonanno would have continued to invest a full 10% of his gross pay over that period; and (iii) that Buonanno will continue to work in a field in which such matching contributions are not common. In the absence of evidence to warrant such assumptions, the Court will not speculate as to the loss of such future benefits. Accordingly, the Court will not include 401(k) matching contributions in its calculation of front pay.

 Finally, Buonanno requests an award of punitive damages. Punitive damages are available in a Title VII action where the plaintiff demonstrates that the employer discriminated in the face of a perceived risk that its actions will violate federal law. *Kolstad v. American Dental Ass'n.*, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). However, such damages are not warranted merely because the employer has discriminated. For example, there may be circumstances where the employer reasonably believes that its discriminatory acts nevertheless satisfies a defense to liability. *Id.*

 Here, the Court finds that punitive damages are not appropriate. First, although most AT&T officials who testified were aware that religious discrimination is prohibited by Title VII, there is no showing that they perceived the risk that failing to accommodate Buonanno's beliefs violated the law. In fact, Buonanno's termination was not necessarily contemplated by anyone other than Batliner. Davis instructed Batliner to talk to Buonanno and gather more information, but did not direct Batliner to effectuate a termination at her own discretion. Batliner's hasty decision to do so, rather than to report back to Davis for further instructions, prevented high-ranking AT&T officials from giving the matter additional, informed consideration. Moreover, Buonanno is partially responsible for the lack of communication. He failed to specifically explain the nature of the conflict between his religious beliefs and the challenged language. He could have specified what particular behavior or beliefs he could not "value," but he chose not to do so, instead positing a hypothetical about "skinheads" that had no relevance to his actual concerns. Because the Court finds that both Buonanno and Batliner contributed to the lack of communication and because Batliner acted without authority, an award of punitive damages would be inappropriate.

Accordingly, Buonanno is entitled to a damage award as follows: backpay and lost 401(k) matching contributions, plus prejudgment interest totaling $93,370; compensation for emotional distress of $4,000; and front pay in the amount of $48,899, for a total damage award of $146,269.